**COMMONWEALTH OF MASSACHUSETTS**
**DEPARTMENT OF THE TRIAL COURT**

**VIRGINIA CROCKER-TIMMINS**
28 Lovett Lane
North Chelmsford, MA 01863

*Plaintiff,*

v.

**GENERAL ELECTRIC COMPANY**
5 Necco Street
Boston, MA 02210

And

**GE PLASTICS a/k/a**
**PLASTICS TECHNOLOGIES, INC.**
1 Plastics Ave.
Pittsfield, MA 01201

And

**MONSANTO COMPANY**
800 North Lindbergh
Blvd. St. Louis, MO
63167

And

**SOLUTIA INC.**
575 Maryville Centre
Drive St. Louis, MO
63141

And

**PHARMACIA LLC**
100 Route 206
North Peapack, NJ 07977

And

**BAYER AG**
800 North Lindbergh
Blvd. St. Louis, MO
63167

**Superior Court Department**

**Civil Action No.:**

**JURY TRIAL DEMANDED**



EC

And

**SABIC INNOVATIVE PLASTICS US LLC**
55 Merrill Road
Pittsfield, MA 01201

And

**SABIC INNOVATIVE PLASTICS TECHNOLOGIES, INC.**
55 Merrill Road
Pittsfield, MA 01201

And

**SABIC INNOVATIVE PLASTICS GLOBAL TECHNOLOGIES L.P.**
55 Merrill Road
Pittsfield, MA 01201

And

**SAUDI BASIC INDUSTRIES CORP. (SABIC)**
P.O. Box 5101
Riyadh 11422, Saudi Arabia

*Defendants*.

**TABLE OF CONTENTS**


I. BRIEF INTRODUCTION TO THE CASE……………………………………….4

II. PARTIES……………………………………………………………………..5

III. VENUE AND JURISDICTION…………………………………………………11

IV. PCB DANGERS, TOXICITY, POISONING, AND CARCINOGENICITY……13

V. MONSANTO HAS KNOWN FOR DECADES THAT PCBS ARE TOXIC…….17

VI. GE HAS DECIMATED AND POLLUTED PITTSFIELD AND BERKSHIRE COUNTY WITH ITS RECKLESS DUMPING, USE, AND DISPOSAL OF PCBS……………………………………………………………………..32

A. GE KNOWINGLY POLLUTED A CHILDREN'S ELEMENTARY SCHOOL AND PLAYGROUND WITH PCBS…………………………...36

B. GE HAS INTENTIONALLY DOWNPLAYED, DISMISSED, AND MISREPRESENTED THE TRUE AND IRREFUTABLE DANGERS OF PCBS TO THE PUBLIC AND PEOPLE OF BERKSHIRE COUNTY……45

C. GE HAS DOWNPLAYED AND MISREPRESENTED HOW SEVERELY GE HAS POLLUTED THE HOUSATONIC RIVER, PITTSFIELD, AND BERKSHIRE COUNTY WITH PCBS…………………………………....49

VII. PCBS AND THYROID CANCER………………………...…...……………..57

VIII. PCBS AND BREAST CANCER……………………………….……………57

IX. PCBS, DIOXINS, AND OTHER HAZARDOUS CONTAMINANTS …...……58

X. CLAIMS AND CAUSES OF ACTION…………………………………………62

PRAYER FOR RELIEF……………………………………………………………91

JURY DEMAND……………………………………………………...………92

## CIVIL ACTION - COMPLAINT

## I. BRIEF INTRODUCTION TO THE CASE

1. This action arises out of the decades-long decimation and destruction of the health and wellbeing of the residents of Berkshire County caused by the Corporate Defendants' intentional, repeated, and blatant pollution, dumping, use, and disposal of toxic and cancerous chemicals known as Polychlorinated biphenyls ("PCBs"). Since the 1930s, and up to this day, the Corporate Defendants, General Electric Company, GE Plastics a/k/a Plastics Technologies, Inc. (collectively referred to as "GE"), Monsanto Company ("Monsanto"), Solutia Inc. ("Solutia"), Pharmacia LLC ("Pharmacia"), Bayer AG ("Bayer"), SABIC Innovative Plastics Technologies, Inc., SABIC Innovative Plastics US LLC, SABIC Innovative Plastics Global Technologies, L.P., and Saudi Basic Industries Corporation (collectively referred to as "SABIC"), have treated this community as their dumping ground, going so far as to allow the dissemination and dumping of PCB-drenched soil in children's playgrounds and schoolyards. This is not to mention the hundreds of thousands of pounds of PCBs that defendant GE has dumped into the Housatonic River, forever ruining that waterway and endangering those who live or work nearby. To be clear: it has been well-established (for decades), in the scientific and medical communities, that PCBs are toxic, dangerous, carcinogenic, and harmful to human beings. The Corporate Defendants have known this for decades yet have consciously disregarded this knowledge for the sake of profiting off of the backs of the hardworking people of this county. Worse than that, as this filing makes clear, the Corporate Defendants have serially downplayed— and, at times, outright misrepresented—to the public the true nature of the dangers and harm posed by PCBs. The Corporate Defendants have made it a nearly-century-long habit to callously disregard the people of Berkshire County.

But, with this filing, the Corporate Defendants can no longer hide from what they have done. They must answer to the people of Pittsfield and Berkshire County. That includes plaintiff, Virginia Crocker-Timmins, who was born in Pittsfield, Massachusetts, and spent her childhood and early adulthood

living, attending school, working, and recreating in Pittsfield and Berkshire County. Plaintiff grew up at 136 Elberon Avenue in Pittsfield, attended Allendale Elementary School, North Junior High School, and Pittsfield High School, and later worked for GE Aerospace during college breaks in 1985 and 1986 before becoming a full-time employee from 1987 through 1995. Throughout those years, Plaintiff was repeatedly and continuously exposed to the highly toxic, poisonous, and carcinogenic PCBs that Defendants manufactured, distributed, used, released, dumped, and allowed to contaminate Pittsfield and Berkshire County, including at and around her home, schools, workplace, and the surrounding community.

Years later, Plaintiff developed papillary thyroid cancer and breast cancer, requiring a total thyroidectomy, radioactive iodine therapy, multiple breast lumpectomies, radiation therapy, a hysterectomy and bilateral oophorectomy, biopsies, and lifelong thyroid hormone replacement therapy. Plaintiff brings this action to hold the Corporate Defendants accountable for the devastating injuries and damages they caused through their decades-long pollution, contamination, concealment, and reckless disregard for the health and safety of the people of Pittsfield and Berkshire County.

## II. PARTIES

2. Plaintiff, Virginia Crocker-Timmins, is an adult citizen and resident of the Commonwealth of Massachusetts and Middlesex County residing therein at 28 Lovett Lane, North Chelmsford, MA 01863.

3. Plaintiff, Virginia Crocker-Timmins, developed breast cancer and thyroid cancer as a direct result of the egregious, negligent, wrongful, and reckless conduct of the defendants in their manufacture, sale, creation, distribution, pollution, contamination, dumping and disposal of the toxic and carcinogenic chemical known as PCBs.

4. Defendant, General Electric Company ("GE"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts and State of New York with its principal place of business located at 5 Necco Street, Boston, Massachusetts 02210.

5. Defendant, GE Plastics a/k/a Plastics Technologies, Inc., is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1 Plastics

Drive, Pittsfield, Massachusetts 01201. For purposes of this Complaint, Defendants, GE and GE Plastics a/k/a Plastics Technologies, Inc., are referred to collectively as "GE."

6. Defendant, SABIC Innovative Plastics US LLC ("SABIC"), is a limited liability company organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 55 Merrill Road, Pittsfield, Massachusetts 01201.

7. Defendant, SABIC Innovative Plastics Technologies, Inc. ("SABIC"), is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 55 Merrill Road, Pittsfield, Massachusetts 01201.

8. Defendant, SABIC Innovative Plastics Global Technologies, L.P. ("SABIC"), is a limited partnership organized and existing under the laws of the Commonwealth of Massachusetts with a principal place of business located at 55 Merrill Road, Pittsfield, Massachusetts 01201.

9. Defendant, Saudi Basic Industries Corp. ("SABIC"), is a corporation organized and existing under the laws of the State of Texas with a principal place of business located at 2500 CityWest Boulevard, Houston, Texas 77042.

10. "SABIC" stands for Saudi Basic Industries Corporation. In 2011, SABIC purchased GE's Pittsfield operation for $11.6 billion in cash plus assumption of liabilities.

11. SABIC is one of the world's largest petrochemicals manufacturers ranked by market capitalization (currently $261.9 billion).

12. From the sale of its Pittsfield business to SABIC, defendant GE netted approximately $9 billion after taxes, which GE then used to re-launch a stock buyback.

13. Defendant, Monsanto Company ("Monsanto"), is a Delaware corporation with its principal place of business located in St. Louis County, Missouri.

14. Defendant, Solutia Inc. ("Solutia"), is a Delaware corporation with its principal place of business located in St. Louis County, Missouri.

15. Defendant, Pharmacia LLC ("Pharmacia"), is a limited liability company organized and existing under the laws of the State of Delaware and is a citizen of New York and Delaware. Pharmacia is a subsidiary of Pfizer, Inc.

16. Defendant, Bayer AG ("Bayer"), is a German corporation with its principal place of business located in St. Louis County, Missouri.

17. Pharmacia is the successor corporation to Monsanto. Therefore, Monsanto is now known as Pharmacia LLC.

18. Monsanto organized and created Solutia in order to own and operate Monsanto's chemical manufacturing business. Previously, Solutia assumed the liabilities of Monsanto's chemical business. Solutia has also previously assumed the operations and assets of Monsanto's chemical business.

19. Defendant, Bayer, previously purchased and acquired Monsanto. Pursuant to this purchase and/or merger, Bayer assumed the assets and liabilities of Monsanto.

20. In the 1930s, Monsanto began manufacturing and distributing PCBs. The PCBs were used in various industrial applications.

21. Defendants, Bayer, Monsanto, Solutia, and Pharmacia, have entered into agreements to share or apportion liabilities and/or to indemnify each other for claims arising out of Monsanto's chemical business which includes the manufacture, distribution, and sale of PCBs.

22. Defendants, Bayer, Monsanto, Solutia, and Pharmacia, have entered into corporate deals or transactions in order to determine their respective obligations (financially and legally) for claims arising out of Monsanto's sale, distribution and manufacturing of PCBs.

23. In a Form 10-K that was filed by Monsanto for the fiscal year ending August 31, 2016, Monsanto, among other things, stated: "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is party in its own name and proceedings to which its

former parent, Pharmacia LLC ('Pharmacia') or its former subsidiary, Solutia, Inc. ('Solutia') is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities."

24. In this same Form 10-K, Monsanto also stated that the company enjoys $545,000,000.00 in the reserve created for these related liabilities.

25. Bayer has recently stated that PCBs "are chemicals that were produced until the 1970s and were used in a wide array of industrial products and building materials."

26. Bayer has recently acknowledged Monsanto's wrongdoing in the pollution of waterways in the United States with PCBs by its agreement to pay $650 million to a class of approximately 2,500 municipal entities for alleged "impairment of their water bodies."

27. Bayer has recently stated that it faces a "limited number of personal injury cases in which plaintiffs claim that exposure to PCBs in schools caused their health problems." The evidence of Monsanto's wrongdoing in these cases is obvious from a survey of recent verdicts related to PCB-caused injuries.

28. As recently as July 14, 2023, a jury in Washington state handed down a $72 million verdict against Monsanto for PCB-related injuries. Earlier, in October 2022, a different jury in Washington state handed down a $275 million verdict against Monsanto for PCB-related injuries. In July 2021, a different Washington state jury handed down a $185 million verdict for PCB-related injuries. In December 2022, a different Washington state jury handed down an $82 million verdict for PCB-related injuries. In November 2021, a different jury in Washington state handed down a $62 million verdict for PCB-related injuries.

29. In 2016, a jury in Missouri found Monsanto liable for $46.5 million in a case

alleging the plaintiff's blood cancer was caused by PCB exposure.

30. On February 28, 2023, Bayer published its Annual Report for the year 2022, which was created principally for Bayer's shareholders to read and understand the risks and liabilities of the company as a whole.

31. In this annual report, Bayer wrote: "Monsanto has broad indemnity agreements with its former PCB customers, and we are seeking to enforce our rights."

32. According to Bayer's 2022 Annual Report, its Supervisory Board consists of the following members: Prof. Norbert Winkeljohann (Chairman); Heike Hausfeld (Vice Chairwoman); Dr. Paul Achleitner; Dr. Simone Bagel-Trah; Horst Baier; Dr. Norbert W. Bischofberger; Andre van Broich; Ertharin Cousin; Dr. Thomas Elsner; Yasmin Fahimi; Dr. Barbara Gansewendt; Colleen A. Goggins; Francesco Grioli; Robert Gundlach; Reiner Hoffman; Fei-Fei Li; Frank Lollgen; Kimberly Mathisen; Petra Reinbold-Knape; Andrea Sacher; Claudia Schade; Michael Schmidt-Kiebling; Heinz Georg Webers; Alberto Weisser; Michael Westmeier; Prof. Dr. Otmar D. Wiestler; and Oliver Zuhlke.

33. According to Bayer's 2022 Annual Report, this Supervisory Board has "work[ed]" and "deliberat[ed]" about "material litigations, including in particular those involving glyphosate and PCBs, which the full Supervisory Board and also the Audit Committee dealt with intensively."

34. According to Bayer's 2022 Annual Report, in its "ordinary meeting in April prior to the Annual Stockholders' Meeting, the Supervisory Board discussed the business performance in the year to date, focusing particularly on the effects of the war in Ukraine and the ongoing glyphosate and PCB litigations."

35. According to Bayer's 2022 Annual Report, at a meeting in June 2022, Bayer's Supervisory Board "once again discussed the situation in Ukraine and Russia, as well as the status of the glyphosate and PCB litigations, and approved the planned conclusion of a settlement with

the US state of Oregon as part of the PCB litigations."

36. According to Bayer's 2022 Annual Report, during an "executive session in July, the Supervisory Board dealt once again with the glyphosate and PCB litigations, focusing on the most recent developments in these lawsuits."

37. According to Bayer's 2022 Annual Report, during this July 2022 executive session, Bayer's "Supervisory Board commissioned a legal review examining the Board of Management's duty of care obligations as part of the Monsanto acquisition with respect to the due diligence performed on the potential legal risks stemming from the PCB litigations."

38. According to Bayer's 2022 Annual Report, in September 2022, Bayer's Supervisory Board held meetings on three consecutive days in Missouri where they discussed "various litigations, and especially the glyphosate and PCB litigations." In these meetings, Bayer emphasized that it felt it had exercised due diligence in how it assessed "legal risks related to PCBs" prior to Bayer's acquisition of Monsanto.

39. In Bayer's 2022 Annual Report, Bayer devoted an entire section of the report to reporting on "material, reportable risks." These risks, according to Bayer, "include all financial and nonfinancial risks that have been classified as high or medium and are at least significant in terms of potential impact after taking into account the risk control measures in place (net risk)."

40. In Bayer's 2022 Annual Report, Bayer acknowledged that its "PCB matters" and PCB-related litigation risk "may materially impact the forecast issued with respect to the financial position and cash flows."

41. In Bayer's 2022 Annual Report, Bayer documented that six trial had taken place involving PCB-related injuries in Washington state resulting in "plaintiffs' verdicts totaling approximately US$267 million in combined compensatory and punitive damages." Despite these repeat findings of liability by multiple different juries, Bayer wrote that the "undisputed evidence

in these cases does not support the conclusions that plaintiffs were exposed to unsafe levels of PCBs or that any exposure could have possibly caused their claimed injuries."

42. In the section of Bayer's 2022 Annual Report entitled "presentation of risks arising from product-related legal disputes," Bayer explicitly listed the fact that Monsanto and its predecessor companies were "manufacturers of PCBs" as one of the "risks" to Bayer as a company.

43. In Bayer's 2022 Annual Report, Bayer wrote that its "Supervisory Board deemed the negative financial impact of the PCB litigations to be so significant that it warranted a closer examination of potential measures beyond the standard practice."

44. In Bayer's 2022 Annual Report, Bayer documented that the "potential PCB-related legal risks arising from the acquisition of Monsanto were known [to Bayer] from the onset and were evaluated" before Bayer purchased Monsanto.

45. In Bayer's 2022 Annual Report, Bayer documented that the "development of the PCB litigations is reflected in the performance of Bayer stock, and therefore has a negative impact on the LTI [long term incentive] payout."

46. In Bayer's 2022 Annual Report, Bayer documented that the development of PCB litigation "also has an adverse effect on the shares held as part of the Share Ownership Guidelines."

## III. VENUE AND JURISDICTION

47. Venue is proper in Berkshire County because the acts and omissions giving rise to Plaintiff's claims occurred in Berkshire County, where Plaintiff was born, resided, attended school, worked, and was repeatedly exposed to PCB contamination. Venue is further proper because defendants, GE and SABIC, each have a regular place of business located in Berkshire County and may sue or be sued therein.

48. Venue is proper in Berkshire County also because defendants, Monsanto, Pharmacia, Solutia, and Bayer have regularly conducted business in Berkshire County through

their sale, distribution, shipment, direction, and placement of their products, including PCBs, into and throughout Berkshire County.

49. This Court has jurisdiction over defendants, Bayer, Monsanto, Solutia, and Pharmacia, because: (1) these defendants have transacted business and transact business in the Commonwealth of Massachusetts specifically in relation to the sale, distribution, procurement, shipment, use, discarding, research into, assessment of risks, assessment of dangers, related to defendants PCB products; (2) these defendants have contracted to supply services or things in the Commonwealth of Massachusetts, including PCBs; (3) these defendants have caused tortious injury by acts and omissions in the Commonwealth of Massachusetts, including the improper, negligent, reckless, and wrongful use, distribution, pollution, discarding, sale, shipment, and disposal of PCBs in the Commonwealth of Massachusetts; and (4) these defendants have caused tortious injury in the Commonwealth of Massachusetts by acts or omissions outside of Massachusetts where the defendants have regularly done and solicited business in the Commonwealth of Massachusetts.

50. Defendants, Bayer, Monsanto, Solutia, and Pharmacia, have engaged in a persistent course of conduct in the Commonwealth of Massachusetts through their ongoing use, distribution, pollution, discarding, sale, shipment, and disposal of PCBs in the Commonwealth of Massachusetts.

51. Defendants, Bayer, Monsanto, Solutia, and Pharmacia, derived substantial amounts of revenue in the Commonwealth of Massachusetts through their persistent, use, distribution, pollution, discarding, sale, shipment, and disposal of PCBs in the Commonwealth of Massachusetts.

52. This Court has jurisdiction over defendants, GE and SABIC, in Massachusetts because: (1) these defendants have transacted business and transact business in the Commonwealth of Massachusetts specifically in relation to the sale, use, distribution, procurement, shipment, discarding, research into, assessment of risks, disposal, assessment of dangers, abandonment, pollution, dumping, remediation, and removal of PCBs; (2) these defendants have contracted to supply services or things in the Commonwealth of Massachusetts, including PCBs and numerous products that utilize PCBs; (3) these defendants have caused tortious injury by acts and omissions in the Commonwealth of Massachusetts, including the improper, negligent, reckless, and wrongful use, distribution, pollution, discarding, sale, shipment, dumping and disposal of PCBs in the Commonwealth of Massachusetts; and (4) these defendants are at home in Massachusetts and have their principal place of business in Massachusetts.

## IV. PCB DANGERS, TOXICITY, POISONING, AND CARCINOGENICITY

53. PCBs are toxic.

54. PCBs are carcinogenic.

55. PCBs are teratogenic.

56. PCBs are comprised of a combination or mixture of synthetic organic chemicals made up of chlorine atoms that are attached to a double carbon-hydrogen ring (*i.e.* "biphenyl"). PCBs take on various forms, ranging from oily liquids to waxy solids.

57. PCBs are made up of various semi-volatile chemicals known as "congeners." A PCB "congener" is any unique, single, chemical compound that falls within the PCB categories. Over two hundred (200) congeners have been identified historically.

58. Monsanto began to manufacture PCBs in the 1930s. From then until 1977, Monsanto was the sole manufacturer of PCBs in the United States that intentionally produced and promoted PCBs for their use in a commercial or industrial setting.

59. During their use, PCBs were often sold under the trade name "Aroclor."

60. Monsanto trademarked the name "Aroclor."

61. From approximately 1929 until 1977, over 1.25 billion pounds of PCBs were produced in the United States.

62. It has long been recognized that PCBs are "extremely toxic to humans and wildlife."

63. PCBs are so toxic and awful that they were a "prime motivator" for the enactment of the Toxic Substances Control Act—a federal law passed by the United States Congress in 1976.

64. As some scholars have described, PCBs "are the archetypal chemical villains against which the contemporary pollution laws are directed."

65. In the late 1970s, the United States banned the manufacture, processing, distribution in commerce, and use of all PCBs. This ban remains in effect to this day.

66. Importantly, PCBs are among the most stable chemicals known to humankind, and PCBs decompose very slowly once they are in the environment. Once distributed into the environment, PCBs are toxic at low concentrations to a wide variety of species.

67. When PCBs are released into the environment, PCBs tend to stay there or move slowly in damaging cycles.

68. PCBs are toxic to mammals at very low exposure levels.

69. PCBs have been found to cause cancer, decreased fertility, still births, and birth defects in test animals.

70. It has been documented and established that PCBs are "highly toxic chemicals frequently used in electrical transformers."

71. Epidemiological data and experiments on laboratory animals indicate that exposure to PCBs poses carcinogenic and other risks to human beings.

72. The United States Environmental Protection Agency ("EPA") has determined that, by 1975, up to 400 million pounds of PCBs had entered the environment. This includes "industrial waste and discarded end use products" that are "believed to be in landfill sites and thus constitutes a potential source of new free PCBs."

73. The EPA has stated that "it is not possible to determine a 'safe' level of exposure to" PCBs.

74. In 1972, Monsanto limited its sales of PCBs to manufacturers of transformers and capacitors, which included defendant GE.

75. The EPA has expressly found that "any exposure of PCBs to the environment or humans could cause adverse effects."

76. As far back as 1985, the EPA has stated that "PCBs are toxic and persistent."

77. According to the EPA, PCBs can enter the body through the lungs, gastrointestinal tract, and skin, circulate throughout the body, and be stored in the fatty tissue.

78. According to the EPA, PCBs are probable human carcinogens.

79. An EPA report on the carcinogenicity of PCBs has determined that "[j]oint consideration of cancer studies and environmental processes leads to a conclusion that environmental PCB mixtures are highly likely to pose a risk of cancer to humans." This same EPA report found that "PCBs persist in the body, providing a continuing source of internal exposure

after external exposure stops. There may be greater-than-proportional effects from less-than-lifetime exposure, especially for persistent mixtures and for early-life exposures."

80. PCB exposure has been linked to cancers of the liver, gallbladder, biliary tracts, brain, stomach, intestines, thyroid, myeloma, non-Hodgkin lymphoma, skin, gastrointestinal tract, hepatocarcinomas, leukemia, lymphoma, prostate, testicles, pancreas, lung, mouth, uterus, ovary, oviduct, adrenal cortex, kidney, heart, thymus, spleen, clitoral gland, mesenteric artery, oral mucosa, bone marrow, bladder, and pituitary tumors.

81. The International Agency for Research on Cancer ("IARC") has determined in no uncertain terms: "PCBs are carcinogenic to humans."

82. The 1996 EPA report also found that PCBs carry numerous other health hazards besides cancer, including neurotoxicity, reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption.

83. Children are more vulnerable to the dangers and risks of PCBs than adults.

84. According to a 2000 statement from the Agency for Toxic Substances and Disease Registry ("ATSDR"), "[h]ouse dust in homes of workers exposed to PCBs contained higher than average levels of PCBs."

85. If a person is exposed to PCBs at their place of work or at school, the ATSDR has found that "it may be possible to carry them home from work" and, therefore, ATSDR recommended showering and changing your clothes before leaving work.

86. Exposure to PCBs has been causatively linked to cardiovascular damage, type 2 diabetes, deficient immune function, neurodegenerative diseases (*e.g.* ALS or Lou Gehrig's disease, Parkinson's disease, and dementia), anxiogenic behavior, depression of the central nervous system, enamel effects in children's teeth, cryptorchidism (undescended testicles),

increased liver enzymes, possible hepatic damage, chloracne, dermal lesions, and respiratory problems.

87. Medical studies have revealed that children's risk of developing acute lymphocytic leukemia increased by two-fold when PCBs were detected in the dust of a room in which the child spent a significant amount of time.

## V. MONSANTO HAS KNOWN FOR DECADES THAT PCBS ARE TOXIC

88. Monsanto was well aware of scientific literature published as far back as the 1930s that established that inhalation of PCBs in industrial settings resulted in toxic systemic effects in human beings.

89. In 1937, Monsanto authored a memorandum, which stated that "[e]xperimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."

90. In 1955, a Monsanto memorandum titled "AROCLOR TOXICITY" by Monsanto's medical director, Emmet Kelly, stated: "We know Aroclors are toxic but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops any type of liver disease and gives a history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to MACs [maximum allowable concentrates]."

91. Another 1955 memorandum from Monsanto stated that workers should not be allowed to eat lunch in the Aroclor department because Aroclor vapors and other process vapors could contaminate lunches unless they were properly protected.

92. As far back as 1955, Monsanto acknowledged that "early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."

93. In the 1950s, Monsanto commissioned a study by researchers at the University of Cincinnati College of Medicine which exposed animals to Aroclor vapors and raised concerns about PCBs' carcinogenicity.

94. In 1957, Monsanto recognized that the U.S. Navy had declined to use Aroclors. In discussing the Navy's refusal to use PCBs, Monsanto's 1957 memorandum states: "No matter how we discussed the situation, it was impossible to change their thinking that [Aroclor-containing] Pydraul 150 is just too toxic for use in a submarine."

95. In or around 1966 or 1967, Monsanto's medical director, Emmet Kelly, reviewed a presentation by a University of Stockholm researcher, which stated that PCBs "appear to be the most injurious chlorinated compounds of all tested." This researcher, in his presentation, pointed to a 1939 study that associated three deaths with PCB exposure and concluded that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."

96. Between 1965 and 1970, Monsanto became aware that PCBs were resulting in widespread and systemic environmental contamination. Despite this knowledge, Monsanto continued to produce PCBs.

97. In 1968, a University of California (Berkeley) researcher, R.W. Risebrough, and others published a study in *Nature* which explained that PCBs are toxic, spread easily, and pose a significant risk of harm to human beings.

98. In 1969, W.M. Richard, a Monsanto employee, wrote a memorandum to fellow Monsanto employee, Elmer Wheeler, titled "AROCLOR WILDLIFE ACCUSATIONS." In this memorandum, Richard commented on this 1968 article contained in *Nature*, which had labeled

PCBs "a pollutant . . . a toxic substance—with no permissible allowable levels . . . [and] a toxic substance endangering man himself."

99. In this memorandum, Richard acknowledged that Monsanto could reduce PCBs released from its facilities, but stated that it "will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In these applications, exposure to consumers is greater and the disposal problem becomes complex."

100. In response to the *Nature* article, Richard also wrote internally to Monsanto: "Either [the *Nature* article's] position is attacked and discounted or we will eventually have to withdraw product from end uses which have exposure problems."

101. Also in 1969, this same Monsanto employee, W.M. Richard, authored a memorandum titled "DEFENSE OF AROCLOR." In this memorandum, Richard set forth Monsanto's commitment to denying scientific reality in forthcoming lawsuits: "Make the Govt., States and Universities prove their case."

102. In this same memorandum, however, Richard wrote that he knew Monsanto "can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore, we will have to restrict uses and clean-up as much as we can, starting immediately."

103. This same 1969 memorandum set forth Monsanto's plan to challenge scientific studies that clearly showed that even low levels of PCBs are dangerous:

Monsanto Prove Bioharmless - Limited work at Ind. Bio-test -

| | | | | |
|---|---|---|---|---|
| "Safe" toxic level for | man<br>mammals<br>fish | via | Rats<br>Chickens<br>Fish | Seek evidence of Biodegradation<br>Question evidence against us.<br>Question shrimp toxicology especially other toxic chemicals.<br>If Aroclor bad, others must be worse. |

Probable Outcome

We can prove some things are OK at low concentration.
Give Monsanto some defense.

104. In 1969, Monsanto was already aware of the global nature of their pollution of the world with PCBs. But they hid it. Worse than that, Monsanto intentionally decided to not remediate and fix the problem because doing so would hurt corporate profits.

105. In a 1969 Monsanto memorandum entitled "PCB Environmental Pollution Abatement Plan," Monsanto acknowledged that the "extensiveness" of its PCB pollution was worldwide and involved "the entire United States":

III. Extensiveness

The problem involves the entire United States, Canada, and sections of Europe especially the United Kingdom and Sweden. As the investigation broadens other areas of Europe, Asia and Latin America will surely become involved. Evidence of contamination have been shown in some of the very remote parts of the world. The involvement could and most likely will follow the DDT investigations.

106. In this same 1969 memorandum, Monsanto was already contemplating its legal liability for polluting the entire country with PCBs:

> A. Legal Liability
>
> Direct lawsuits are possible. The materials are already present in nature having done their "alleged damage". All customers using the products have not been officially notified about known effects nor our labels carry this information. These are only a few of the possible legal implications which would best be covered by the legal department.

107. As this memorandum acknowledges: "All customers using the products have not been officially notified about known effects nor our labels carry this information."

108. In this memorandum, Monsanto also acknowledged its concern with its "corporate image" if it were to come to light that Monsanto had polluted the entire world with toxic chemicals:

> B. Public Image
>
> The corporate image of Monsanto as a responsible member of the business world genuinely concerned with the welfare of our environment will be adversely affected with increased publicity.

109. In this same memorandum, Monsanto admitted that "the evidence proving the persistence of [PCBs] and their universal presence as residues in the environment is beyond questioning":

> The evidence proving the persistence of these compounds and their universal presence as residues in the environment is beyond questioning. This combined with certain scare publications is cert to give an adverse image. Guilty by association (with DDT) will prevail as the background while actual facts may be sparse.

110. As reflected in this 1969 memorandum, Monsanto eerily, callously, and coldly made a conscious decision to continue to sell PCBs despite knowing that PCBs were endangering

the health of human beings worldwide. In the section of the memo titled "Courses of Action," Monsanto concluded it had three options: (1) "Do Nothing"; (2) "Discontinue Manufacture of All Polychlorinated Biphenyls (PCB)"; or (3) "Respond responsibly, admitting that there is growing evidence of environmental contamination by the higher chlorinated biphenyls and take action as new data is generated to correct the problem."

111. With respect to the first option ("Do Nothing"), Monsanto wrote:

> A. Do Nothing
>
> We cannot deny the findings and the acquisitions by the various agencies. If we took no action we would likely face numerous suits. We would let government tolerances be based on public and political pressure along with any experimental or developed data which they may generate. We would most likely be forced out of this business. Other product areas would be adversely affected. We would project an image as an irresponsible member of the business world. Project poor customer relations. The only advantage to this technique offers is it reduces the cost but this too must be weighed against potential loss of business.

112. With respect to the second option ("Discontinue Manufacture of All Polychlorinated Biphenyls (PCB)"), Monsanto wrote:

> B. Discontinue Manufacture of All Polychlorinated Biphenyls (PCB)
>
> Although we all realize this could be an eventually unfortunately the solution is not this simple. Assuming we did stop manufacture immediately, the pollutants are present in the environment, the liability is present and possibly by the shifting to the lower chlorinated materials and the recovery techniques the contamination

> may already be reduced to an acceptable level. Obviously the entire business would be lost without any or very few substitutes to be offered. Other product areas would be affected. Financial loss could be considered due to raw material contracts, customer contrac' and royalty -- secrecy contracts. Competition would take advantage on all fronts. We would be admitting guilt by our actions. Loss of capitol investment in the plant, associated utilities, and associated processes. We would possibly gain a little public image on this action.
>
> STR 021951

113. With respect to the third option ("Respond responsibly, admitting that there is growing evidence of environmental contamination by the higher chlorinated biphenyls and take action as new data is generated to correct the problem"), Monsanto wrote:

> This approach would enable us to phase out the higher chlorinated materials in many applications where they are no longer necessary or really desired. Wecould maximize the corporate image by publicizing this act. We would reduce a known pollutant. Additionally we could gain precious time needed to develop new products and investigate further the lower chlorinated materials. As new research data is generated our course may be altered considerably. Certain limited actions may reduce or limit the problem.

114. In considering which of these options to select, Monsanto's focus was always on its own corporate profits rather than the safety of the human beings it had been poisoning for decades. This is evidenced in handwritten charts that accompany the 1969 memorandum:

PROFIT AND LIABILITY VS TIME






115. In 1970, Monsanto employee, Elmer Wheeler, who worked in the medical department, circulated laboratory results of animal studies Monsanto had performed regarding PCB exposure. Among other things, Wheeler stated: "Our interpretation is that the PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated."

116. Around this same time, Monsanto retained Robert Metcalf, a University of Illinois researcher, to assess its PCB dilemma. Metcalf notified Monsanto: "there is an important environmental quality problem involved in wastes of PCB." (emphasis in original).

117. Metcalf also notified Monsanto: "the evidence regarding PCB effects on environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto. The defensive measures presently underway will do little if anything to refute the evidence already presented."

118. Despite receiving this information, Monsanto continued to market and sell PCBs in remarkable amounts. In April 1969, for example, Monsanto's then-president requested that Monsanto's Board of Directors approve $1.1 million in appropriations to *expand* PCB production.

119. In August 1969, Monsanto's "PCB Committee" held a meeting. Handwritten notes from the meeting authored by a Monsanto employee state: "Subject is snowballing." The notes identify three options: (1) "go out of business"; (2) "sell the hell out of them as long as we can and do nothing else"; and (3) "try to stay in business in controlled applications – control contamination levels." (emphasis in original).

120. Monsanto's decision to continue making and distributing PCBs was directly linked to Monsanto's corporate profit motive. To this end, Monsanto created a "PCB Presentation to Corporate Development Committee." In this, Monsanto stated: "Do[ing] nothing was considered unacceptable from a legal, moral, customer, public relations & company policy viewpoint." Despite the unacceptability of PCBs, Monsanto stated, in this presentation, that discontinuing its PCB business "was considered unacceptable from a Divisional viewpoint . . . there is too much customer/market need and selfishly too much Monsanto profit to go out."

121. Monsanto formed an Aroclor Ad Hoc Committee. The objectives of this committee were to "submit recommendations for action which will: 1. Permit continued sales and profits of Aroclors and Terphenyls. 2. Permit continued development of uses and sales. 3. Protect image of Organic Division and of the Corporation." At this time, Monsanto acknowledge that PCBs "may be a global contaminant."

122. Monsanto previously stated (with respect to PCBs): "Our in-plant problems are very small vs. problems of dealing with environmental contamination by consumers."

123. In 1969, Monsanto's Aroclor Ad Hoc Committee issued a confidential report in which the committee reported environmental PCB contamination causing the killing of marine species and the possible extinction of several species of birds. The committee also wrote it "believes that there is no ~~possible~~ practical course of action that can so effectively police the uses of these products as to prevent completely some environmental contamination." In this same report, Monsanto also wrote: "There are, however, a number of possible actions which must be undertaken in order to prolong the manufacture, sale, and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series."

124. This Monsanto committee also stated:

> It has been recognized from the beginning that other functional fluid uses could lead to losses of the Aroclors to liquid waste streams from the customers' plants. Losses could occur from spills, unusual leakage of large volumes and daily losses of smaller volumes.
>
> It has also been recognized that there could be vapor losses but it has been felt that these were perhaps of less significance than the vapor losses in plasticizer applications. The concern for vapor losses rises from the published proposed theory that even minute quantities of vapors are eventually transferred to the water environment and accumulated therein.
>
> Another possible source of air environmental contamination is the eventual destruction of materials which have Aroclors in them. Of particular significance might be the burning or partial incineration of waste or used products containing the Aroclors.

125. Even though Monsanto recognized the grave harms of PCBs, Monsanto was still concerned about losing the production of PCBs and the associated "sales of this very profitable series of compounds":

Budgetary Considerations

The committee recognizes the restrictions placed on those currently involved by mandates to operate within normal or proposed reduced budgets. It should be clear, however, that the product groups, the Division and the Corporation are faced with an extraordinary situation. There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds. If the products, the Division and the Corporation are to be adequately protected, adequate funding is necessary.

126. Despite all its above-referenced knowledge, Monsanto decided to not warn customers and consumers, including defendants GE and SABIC, regarding the dangers, toxicity, risks, and carcinogenicity of PCBs. Any statements that Monsanto has made regarding the dangers of PCBs have been diluted, incomplete, and inadequate to communicate the true severity and extent of the dangers and health concerns associated with PCBs. Monsanto has consistently placed its profit motive above the safety of its customers and consumers.

127. For example, in 1970, Monsanto told certain PCB representatives and customers that Monsanto "can't afford to lose one dollar of business." Monsanto also stated: "We want to avoid any situation where a customer wants to return fluid."

128. In or around 1970, Monsanto achieved record production and sales of PCBs.

129. Worse than failing to adequately warn about the dangers of PCBs, Monsanto went so far as to intentionally and affirmatively downplay the dangers of PCBs. For example, Monsanto previously advised public officials that Monsanto's PCBs "are not particularly toxic by oral ingestion or skin absorption" and that "infrequent exposure to PCB vapor should not cause ill effects."

130. Monsanto even told a member of Congress that it "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."

131. Monsanto told another government official: "Based on available data, manufacturing and use experience, we do not believe the polychlorinated biphenyls to be seriously toxic."

132. In 1971, when the United States government formed a task force to examine existing data about PCBs, *The New York Times* covered this issue. When speaking with a reporter from *The New York Times*, a spokesperson for Monsanto "said that no ill effects had yet been detected." Yet, internally, Monsanto was saying the opposite about their studies, which they acknowledged caused adverse effects to the living test subjects.

133. In 1975, Monsanto employee, W.B. Papageorge, who was then Manager of Product Acceptability, Specialty & Process Chemicals, wrote that PCBs "can have permanent effects on the human body . . . There is a potential real effect to humans – including death."

134. In this same year, as the reign of PCBs was coming to an end, Monsanto manipulated a study that it had commissioned from Industrial Biotest Laboratories ("IBL"). In IBL's study, which IBL presented to Monsanto, IBL wrote that Aroclors (*i.e.* PCBs) were "slightly tumorigenic." Upon reading these results, Monsanto asked IBL to change the language to instead state that the Aroclors do "not appear to be carcinogenic." IBL complied with this request.

135. Against this backdrop of Monsanto's vast fund of knowledge concerning the dangers and ill effects of PCBs, Monsanto aggressively marketed, sold, and distributed PCBs in a wide array of products, including household goods, electrical equipment, paint, sealants, food cookers, furnaces, floor wax, insecticides, lubricants, moisture-proof coatings, papers, asphalt, leather adhesive, and stucco."

136. It has been judicially determined that "[t]hough Monsanto was aware of PCBs' toxicity and propensity to leach, it denied or misrepresented those facts to government investigators" and continued to "manufacture, promote, and profit from its PCBs."

137. In 1975, Monsanto convened a "Study Group" regarding PCBs, which concluded that with "passage of the Toxic Substances Act, the company will have an additional legal defense against such litigation."

138. Even when Monsanto decided in the late 1970s to stop making PCBs, its motivation for doing so was self-centered and had nothing to do with the safety of human beings or living organisms.

139. In fact, Monsanto's PCB Study Group addressed, in 1975, the following question: "Is the adverse impact now, or in the future, likely to be greater than the benefits derived from staying in the business?" This PCB Study Group concluded: "in answer to the question at hand, the negative impact on Monsanto's image will, indeed, exceed the benefits derived from staying in the business." In other words, it was Monsanto's concern for its own "image"—not concern for the safety of people—that motivated its decision to stop making PCBs.

140. When Monsanto internally decided to stop selling PCBs—knowing that a government ban was inevitable and soon to come—Monsanto wrote: "Principally, Monsanto must, not be viewed as being forced into a decision to withdraw from PCB manufacture by either government action or public pressure. Rather, key audiences must perceive Monsanto as having initiated responsible action."

141. Although the Toxic Substances Control Act passed the U.S. Senate in March 1976, Monsanto continued to sell PCBs until at least October 31, 1977.

142. Monsanto intentionally failed to warn customers and the public, including plaintiff, the residents of Pittsfield, and all residents of Berkshire County, regarding the toxicity, carcinogenicity, and hazards of its PCB products.

143. Monsanto's PCBs are not reasonably safe and are defective and unreasonably dangerous because they are extremely toxic (including carcinogenic) to an extent beyond that which an ordinary consumer would expect or contemplate.

144. Monsanto's PCBs were not reasonably safe as designed under a balancing test, risk-utility test, or consumer expectations test.

145. Monsanto's PCBs were the factual and proximate cause of the injuries, damages, and/or cancer of plaintiff.

146. Monsanto's PCBs are not an unavoidably safe product.

147. Monsanto's PCBs are not reasonably safe due to inadequate warnings when manufactured and after manufacture.

148. Any warnings Monsanto included to the non-Monsanto parties in this case, including defendants GE and SABIC, about the extreme toxicity and carcinogenicity of PCBs, were inadequate and a factual and proximate cause of plaintiff's cancer and damages.

149. Any warnings Monsanto included to the non-Monsanto parties in this case, including defendants GE and SABIC, about the extreme toxicity and carcinogenicity of PCBs, were inadequate and a factual and proximate cause of the injuries, damages, and/or cancer of plaintiff.

150. Monsanto had actual knowledge of the defects and dangers of PCBs yet showed complete and utter indifference and conscious disregard for the safety of others by producing, distributing, manufacturing, promoting selling, and disposing PCBs.

## VI. GE HAS DECIMATED AND POLLUTED PITTSFIELD AND BERKSHIRE COUNTY WITH ITS RECKLESS DUMPING, USE, AND DISPOSAL OF PCBS

151. Between 1932 and 1977, defendant GE manufactured and serviced electrical transformers containing PCBs at its Pittsfield plant.

152. For decades, GE knowingly, intentionally, improperly, and recklessly disposed of and dumped PCBs into the surrounding communities and the Housatonic River, forever ruining the river and forever damaging generations of families in Berkshire County.

153. GE had easy access to the Housatonic River, which GE malevolently used as its dumping ground:




154. The EPA has already concluded that GE's improper disposal of PCBs "led to extensive contamination around Pittsfield, MA as well as down the entire length of the Housatonic River."

155. The Housatonic River is approximately 150 miles long, starting on the East Branch in Hinsdale, Massachusetts and flowing south through Berkshire County, into Connecticut, and out into the Long Island Sound.

156. In the EPA's own webpage titled "EPA Cleanups: GE-Pittsfield/Housatonic River Site," the EPA has stated that "PCBs have been linked to cancer and other serious effects on the immune system, reproductive system, nervous system, endocrine system and other organs."

157. GE's contamination of the Housatonic River is so severe that there has been a complete ban on any fishing or consumption of fish from the Housatonic River since 1977. This ban will remain in place until PCB levels decrease. This ban is in effect today.

158. According to the EPA, the "Housatonic River and its floodplain are heavily contaminated with PCBs originating from the GE Facility in Pittsfield, MA."

159. According to the EPA, "PCBs are present in large quantities in river sediment and floodplain soil; estimates range from between 100,000 to nearly 600,000 pounds of PCBs."

160. Records have revealed that GE purchased an estimated 190 million pounds of PCBs over a period of multiple decades, which were used as a dielectric fluid to insulate its electric capacitors from overheating. At all times, there were feasible safer alternatives to PCBs for the purposes which they were used by GE, including but not limited to silicon.

161. According to the EPA, the PCBs that GE contaminated the Housatonic River with are "persistent in the environment and resistant to biodegradation. As a result, the rate of degradation of the type of PCBs in the Housatonic River is very slow – on the scale of hundreds of years."

162. According to the EPA, "PCBs can travel long distances in the air and via suspended solids in water and be deposited in areas far from where they were originally released."

163. According to an internal memorandum prepared by GE employee, Kenneth R. Murphy, in 1970, GE determined that controlling its PCB waste stream would be a "major undertaking" and estimated that GE discharged approximately 500,000 pounds of PCBs "directly to bodies of water" every year.

164. In addition to the PCBs that Murphy acknowledged were dumped directly into "bodies of water," in addition, Murphy's 1970 memorandum stated that an additional 900,000 pounds of PCBs were taken away by contractors "who dispose[d] of it in an 'out of sight, out of mind' manner." In this memorandum, Murphy wrote that "[f]ew, if any, scavengers give consideration to proper disposal of hazardous waste."

165. When later interviewed in 2013 or 2014 about his 1970 Monsanto memorandum, Murphy stated: "I think the company wanted to understand the size of the problem."

166. GE often referred to PCBs as "Pyranol," which was a GE trademark.

167. In a May 1970 letter by GE, the letter noted that Monsanto "has been reviewing procedures to be sure that these materials do not find their way into land or water environment."

168. In October 1969, a product-safety engineer at GE delivered a report to a high-ranking GE engineer which cited troubling reports by Monsanto and newspaper stories, referencing PCBs "hormone destroying activity" and comparing them to insecticides like dichloro-diphenyl-trichloroethane ("DDT").

169. In this 1969 memo, GE engineer, James S. Nelson, wrote (with regard to PCBs): "The broad class of materials we are dealing with here . . . contains known or suspected carcinogens." Thus, not only did Monsanto know, but GE also knew, as far back as at least 1969, that PCBs cause cancer.

170. In 1976, GE authored another report about PCBs that it titled "The Problem."

171. In this report, GE stated that "PCBs have been an environmental concern since the late 1960s."

172. According to the EPA, the "heavier PCBs, such as the ones in the Housatonic watershed (Aroclors 1254 and 1260), are more persistent in the environment because they are more resistant to volatilization, weathering, biodegradation and other mechanisms of degradation."

173. As the EPA has explained, when there are storms, this causes "out of bank" events where the amount of water exceeds the amount that can be contained in the river channel, which forces water and associated sediment/soil and PCBs to flow out of the river onto the floodplain (*i.e.* surrounding land). The EPA has determined that these "out of bank" events "have occurred often enough to result in PCB concentrations in floodplain soil that pose risks to humans and to ecological receptors in the floodplain."

174. In 1998, the EPA's New England Office completed risk evaluations on human health and ecological impacts on a two-mile section of the Housatonic River.

175. Per this 1998 assessment, EPA concluded that "[y]oung children and teenagers playing in and near portions of the river face noncancer risks that are 200 times greater than EPA considers safe. Noncancer effects from PCBs may include liver and nervous system damage and developmental abnormalities, including lower IQs."

176. Per this 1998 assessment, 91 of 93 sediment samples taken in the Upper Reach of the river showed the presence of PCBs.

177. Per this 1998 assessment, the EPA concluded that "the entire two-mile section of the river may present and imminent and substantial endangerment to human health and the environment." The EPA also found that "previously cleaned-up floodplain areas are being re-contaminated by PCBs from the river during routine flooding."

178. The EPA also performed a Human Health Risk Evaluation which was co-authored by the Massachusetts Department of Environmental Protection ("DEP"). This evaluation "examined cancer and noncancer risks to humans based on PCB contamination levels in river sediment, riverbank soils and backyard soils as well as consumption of fish caught in the river."

179. Per this assessment, the EPA and Massachusetts DEP "conclude[d] that there are significant human health risk along the entire two-mile stretch of river."

180. Per this assessment, EPA and the Massachusetts DEP concluded that multiple sections of the two-mile stretch of the Housatonic River pose an increased cancer risk "beyond levels that EPA considers acceptable."

### A. GE KNOWINGLY POLLUTED A CHILDREN'S ELEMENTARY SCHOOL AND PLAYGROUND WITH PCBS

181. GE previously designated its "Hill 78" as GE's hazardous waste storage facility where substantial amounts of PCBs have been discarded and dumped. Shockingly, Hill 78 abuts Allendale Elementary School and, quite literally, flows downhill into the elementary school property:




EPA
Allendale School Cap
GE Parking Lot
Allendale School
Building 71 Consolidation Area
71
Hill 78 Landfill \ Consolidation Area
78
P G & E Generating Facility
New York Ave
Merrill Road



182. On March 7, 2006, a group of practicing Pittsfield physicians, Siobhan McNally, M.D., Richard Rosenfeld, M.D., Alan Kulberg, M.D., Jacqueline Jones, M.D., Diane Piraino, M.D., Gary Shalan, M.D., John Dallenbach, M.D., Julia Feudo, M.D., Brian Dempsey, M.D., Michael Fabrizio, M.D., and Vicki Smith, M.D. wrote a letter to then-Mayor of Pittsfield, James Ruberto, warning about the dangers of PCBs posed to the children of Allendale Elementary School. In this letter, the doctors wrote:

> Dear Mayor Ruberto,
>
> The Allendale School Task Force, made up of a group of parents and teachers, met recently with the purpose of promoting an environmentally safe school for children and staff. We support the Task Force's assertion that every child has the right to attend an environmentally safe school. We believe that as long as hazardous waste dumping continues at Hill 78, Building 71, and other adjacent areas near this school, it will be difficult to assure this right. We therefore urge the community to speak out to community leaders and politicians to stop the dumping and cap these sites. Our concerns are based on the following:
>
> Even with the best of intentions, attempts to adequately monitor Allendale School and Hill 78 areas by GE and various Federal and State agencies have fallen short and have been subject to a variety of interpretations. Adherence to outdated protocols and miscommunications between agencies has further undermined the monitoring process.

to outdated protocols and miscommunications between agencies has further undermined the monitoring process.

There is an emerging body of scientific information pointing to airborne (both volatilized and suspended) PCB's as being a significant form of exposure, something that was barely understood at the time the consent decree was signed. The U.S Department of Health and Human Services, Agency for Toxic Substances and Disease Registry (ATSDR), clearly states that breathing air near hazardous waste sites is a potential route of exposure to humans.

The unique vulnerabilities of children also demand special emphasis. To quote the ATSDR's 2003 Review of the GE Site – Hill 78 Area, "children are at greater risk than adults from certain kinds of exposure to hazardous substances emitted from waste sites. They are more likely exposed because they play outdoors and because they often bring food into contaminated areas. Because of their smaller stature, they might breathe dust, soil, and heavy vapors close to the ground." We absolutely agree with this.

The ATSDR report also emphasizes that, "if the use of the site (e.g. residential development) or its physical characteristics were to change (e.g. excavations in areas of higher subsurface PCB levels), the conditions of institutional controls (e.g. fences) were to deteriorate, or remedial activities are not properly maintained by the environmental regulatory agencies and GE (e.g. the land fill cap), the site would likely pose a public health hazard in the future, depending on the extent to which opportunities for exposure increase". The movement of large trucks over the site and the dumping of additional hazardous wastes at Hill 78 have clearly changed the physical characteristics of the site, and place the Allendale School children at potential health risk.

Finally, to again quote from this Review, "Most importantly, children depend completely on adults for risk identification and management decisions ...."

We applaud the initiative of the Allendale School Task Force, and we urge GE and EPA to consider safer alternatives than the consolidation of PCB wastes adjacent to an elementary school. We should not let these children and our community down.

Sincerely,

Siobhan McNally, M.D.
Richard Rosenfeld M.D.
Alan Kulberg, M.D.
Jacqueline Jones, M.D.

Diane Piraino, M.D.
Gary Shalan, M.D.
John Dallenbach, M.D.
Julia Feudo, M.D.
Brian Dempsy, M.D.
Michael Fabrizio, M.D.
Vicki Smith, M.D

The above names represent all the practicing pediatricians in Pittsfield

Cc: Allendale School Task Force, City Council, State Representatives, State Senators, EPA, DPH, BHS Administration, Berkshire Eagle

183. One week later, on March 14, 2006, two of these Pittsfield pediatricians, Siobhan McNally, M.D. and Richard Rosenfeld, M.D., wrote another letter more fully explaining the harmful dangers posed to children at Allendale Elementary School due to PCB exposure:

March 14, 2006

Mayor James Ruberto
City Hall
70 Allen Street
Pittsfield, MA 01201

Dear Mayor Ruberto,

This is a follow up to our letter to you from March 7, 2006, supporting the Allendale School Task Force in requesting the halting of hazardous waste dumping at Hill 78, Building 71, and other adjacent areas. Thank you for taking the time to read this information. We wanted to expand on that letter and state why we feel we are putting our children at risk. Our concerns center on the following:

- The information regarding cancer risks, endocrine disruption, neurodevelopmental problems, to site just a few effects, continue to mount, and we believe air exposure to PCBs poses a real threat to the children and staff at Allendale School. We need to act in a preventative and precautious manner when dealing with our children's health. Several studies have reported health effects of living near hazardous waste sites (review by Vrijheid, 2000). Evidence that humans are exposed to PCBs by air contamination continues to grow (Sergeev and Carpenter, 2005; Baibergenova et al 2003; Carpenter et al 2001,2003; Kudyakov et al 2004).

- Other PCB hazardous waste sites (Hermanson et al, 2003) have been shown to have elevated volatile PCBs, and there is no reason to expect things are different here.

- The number of air tests per year around the school has been inadequate – about 6-10 per year since 1999 North of the On Plant Consolidation Area (OCPA). Since November of 2005[1], testing has been more frequent, prompted primarily by citizens' concerns about inadequate monitoring.

[1] It is also important to note that since November, 2005 trucks were not moving, and that winter is typically a season in which PCB volatilization is relatively low compared to the warmer months. Elevated PCB ambient air levels during wintertime would be particularly worrisome as levels are typically higher during the warmer months.

- Based on performance standards used by EPA's Human Risk Assessment for the Rest of the River which used 3.4 nanograms/m3 as their threshold for excessive risk, PCB ambient air levels at the consolidation sites have indeed been elevated. On November 1-2, 2005, PCB ambient air levels North of the On Plant Consolidation Area (OPCA) were 11 and 23 nanograms/m3, and on October 6-7, 2005 the level was 18 nanograms/m3 According to Dr. Carpenter (personal communication), there is strong evidence that normal 'background' air concentrations of PCBs are about 1 to 1.5 nanogram/m3.

- The air (different than the filters meant to catch particulate matter) inside the school has only been monitored twice as best as we can tell by the DPH (November 22, 2005, and Dec 1, 2005).

- To date, there has not been any analysis of school air filters using the most up to date, congener specific methods, except by Dr. David Carpenter's Lab at the University of Albany, and his report detected PCBs in filter's from the fall of 2005).

- The methods the EPA/DPH have used to detect PCBs have not been congener specific. Congener specific testing is felt to be a more accurate way to measure PCBs, especially as PCB mixtures change over time, and is considered the current standard of measurement.

- There is a growing concern among scientists that the EPA's "alert level" of 50 nanograms/m3, and their alarm level of 100 nanograms/m3 are too high.

- The physical proximity of the waste site to the school and schoolyard is (and has been) dangerously close. This is an observation we feel does not need excessive scientific backing.

We hope this information is helpful, and also hope you can become an advocate in this movement to stop the hazardous waste dumping at the GE site.

Sincerely,

Richard Rosenfeld, M.D. Siobhan McNally, M.D.

Cc: Allendale School Task Force, City Council, State Representatives, State Senators, School Superintendent, EPA, DEP, DPH,BHS Admin, Berkshire Eagle

**References**

Vrijheid M 2000. Health effects of residence near hazardous waste landfill sites: a review of epidemiologic literature.
Environ Health Perspect 108 (suppl 1): 101-112.

Sergeev A V, Carpenter DO. 2005. Hospitalization rates for coronary heart disease in relation to residence near areas contaminated with persistent organic pollutants and other pollutants. Environ Health Perspect 113: 756-761.

Baibergenova A, Kudyakov R, Zdeb M, Carpenter, DO. 2003. Low birth weight and residential proximity to PCB-contaminated waste sites. Environ Health Perspect 111: 1352-1357.

Carpenter DO, Shen Y, Nguyen T, Le L, Lininger LL. 2001. Incidence of endocrine disease among residents of New York areas of concern. Environ Health Perspect 109: 845-851.

Carpenter DO, Nguyen T, Le L, Baibergenova A, Kudyakov R. 2003 Profile of health effects related to proximity to PCB –contaminated hazardous waste sites in New York. Fresenius Environ Bull 12: 173-180.

Kudyakov R Baibergenova A Zdeb M Carpenter DO. 2004. Respiratory disease in relation to patient residence near to hazardous waste sites. Environ Toxicol Pharamacol: 18:249-257.

Hermanson MH, Scholtan DA, Compher K. 2004 Variable air temperature response of gas-phase atmospheric polychlorinated biphenyls near a former manufacturing facility. Environ Sci Technol 37:4038-4042.

www.epa.gov/ne/ge/thesite/opca-reports.html

www.epa.gov/ne/ge/thesite/allendale-reports.html

184. In 2007, testing of the soil at Allendale Elementary School revealed "unacceptable" levels of PCBs. Hill 78, GE's aforementioned toxic PCB dump, sits just forty (40) feet from Allendale Elementary School.

185. Ambient air testing has revealed that, to this day, there are detectable levels of PCBs in the air on the Allendale Elementary School property. In fact, the levels of detectable PCBs in air sampling at Allendale Elementary School were *higher* in 2021 than they were in 2020. The levels of detectable PCBs in air sampling done in July 2022 at Allendale Elementary School were *higher* than the levels were in 2021 and 2020.

186. As recently as October 2018, multiple wells testing for contamination in groundwater near Hill 78 and near Allendale Elementary School tested above benchmarks.

187. Inexcusably, GE and SABIC chose to not install a bottom liner beneath Hill 78. This means that when there is a lot of rain—which there always is in Berkshire County—more PCBs and chemicals leach out of the bottom of Hill 78 and into surrounding areas, including Allendale Elementary School.

188. The levels of PCBs at or near Allendale Elementary School were of such concern that the Pittsfield City Council held meetings to address these concerns in the past several years. At this meeting, one participant warned: "This is a health issue for not only the children that go to Allendale School but all of us who live in the City of Pittsfield."

189. Indeed, the Allendale Elementary School is so affected by PCBs that the EPA has designated an entire webpage to Allendale Elementary School.

190. Where the Allendale Elementary School sits used to be a farm where horses were bred.

191. In 1950, the parcel of land upon which the school sits was donated to the City of Pittsfield for use as a school.

192. In 1950, defendant GE and the City of Pittsfield entered into an agreement under which the City of Pittsfield was allowed to remove soil from GE property for use as "fill material" at the school grounds.

193. This "fill material" that GE sold to the City of Pittsfield was taken directly from GE's Hill 78 and used to layer the playground. GE knew that the soil it was selling the City of Pittsfield was riddled with toxic PCBs that would be used to layer a school, including a children's playground.

194. In 1991, after GE was exposed as having sold the City PCB-laden soil that was used throughout the Allendale Elementary School property, including the playground, GE installed a

soil cap over some *but not all* of the areas of the playground that were contaminated by PCBs. However, the soil cap that GE installed was grossly inadequate and failed to contain the PCBs.

195. For example, in 1998, seven years after installation of the soil cap, soil that was on top of the soil cap was tested and revealed PCBs at concentrations exceeding 2 parts per million (ppm).

196. Soil sampling at Allendale Elementary School has consistently revealed levels of PCBs in the soil even after some removal efforts were made.

197. PCBs have also been detected inside of the Allendale Elementary School building per multiple testing methods. Numerous samples exceeded guidelines for PCBs.

### B. GE HAS INTENTIONALLY DOWNPLAYED, DISMISSED, AND MISREPRESENTED THE TRUE AND IRREFUTABLE DANGERS OF PCBS TO THE PUBLIC AND PEOPLE OF BERKSHIRE COUNTY

198. Despite the obvious havoc that GE's improper use and disposal of PCBs has caused the residents of Pittsfield and Berkshire County, GE executives have snubbed their noses at these residents for decades and never taken full responsibility.

199. Worse than that, GE, at its highest levels, have ignored science and lied to the public about the well-known human health hazards posed by PCBs.

200. For example, GE's former CEO from 1981 until 2001, Jack Welch, was interviewed in 2002 by renowned journalist and former White House Press Secretary to President Lyndon B. Johnson, Bill D. Moyers, about PCBs. Welch began working at GE at age 24. In 1973, Welch became vice president of GE's chemical division. During much of his time at GE, Welch's main office was in Pittsfield.

201. During this interview, Jack Welch stated: "We haven't proven PCBs even harm anyone." Jack Welch made this statement on television despite knowing it was false and that PCBs, in fact, are very harmful to human beings.

202. During this interview, after being challenged by the interviewer, former White House Press Secretary Moyers, who said: "Now, Jack, you don't believe that. You believe they do harm people," Mr. Welch responded: "No, I don't believe that, but I'm not arguing that case."

203. In response to this answer, former White House Press Secretary Moyers stated: "I have a hard time accepting that you don't believe by now that PCBs are harmful . . . there are plenty of studies." In response, Mr. Welch falsely stated, with respect to the multiple studies referenced by Moyers: "And none of them have proven it."

204. In a published statement in *The Berkshire Eagle*, Jack Welch was quoted: "We simply do not believe that there are any significant adverse health effects from PCBs."

205. Documents reveal that, despite claiming ignorance to the public, GE was warned about health threats of PCBs decades before it was ordered to dredge various sites contaminated by PCBs.

206. As early as the 1960s, company officials at GE were warned of the potential serious health threats of PCBs, which GE engineers described as "hazardous waste."

207. GE has been so devoted to refusing to take responsibility that, in 1991, an internal team at GE drafted a detailed and confidential plan to challenge the EPA. This 67-page report discussed a multimillion-dollar public relations campaign that included a plan to "establish an intelligence network at regulatory agencies," influence media outlets, and use connections to pressure regulators and elected leaders at all levels of government. The goal of this campaign, according to the 1991 report, was to "alter perception on PCBs and dredging" and "change regulatory treatment of PCBs."

208. In this 1991 report, GE documented its plan to send a "basic message" that "cancer potency factors" were overestimated and that PCBs biodegrade naturally and are, therefore, less toxic.

209. In this 1991 report, GE also documented it would maintain the position—despite mounting scientific evidence to the contrary—that "neurotoxic effects in children are not attributable to PCBs."

210. In this 1991 report, GE identified various targets of its PCB misinformation campaign, including then-Governor of New York Mario Cuomo, the heads of various state agencies, the EPA, the White House, members of Congress, and elected officials from river towns.

211. A former GE worker who worked at the Pittsfield plant has testified that he saw a PCB-filled tanker by the Housatonic River with open valves, leaking PCBs into the ground and into the river. Thinking this was an oversight or mistake, the GE worker closed the valve, according to his testimony. The next day, he testified, he returned to the site to find the valve opened again and the tank empty.

212. In a May 19, 1981 letter written by R. Kelly Niederjohn to GE employee, R.J. Desgrosfillers, who worked at GE's Pittsfield plant, Niederjohn warned GE that if GE did not address the effects of its improper disposal of PCBs then "our children and grand children will get bit by our neglect." In its entirety, the memorandum stated:

50 Putnam Ave.
Pittsfield, Mass.
01201
May 15, 1981

General Electric Co.
100 Woodlawn Ave.
Pittsfield, Mass.
01201

Attn: Mr. R. J. Desgrosfillers, Bldg 42 - 306

Dear Ron:

The 10C oil around the Transformer Plant is being collected but what about the Pyranol scattered around the community?

It is in the land fill, the sewer treatment plant, off Potter Mountain Road, Nassau, N.Y. and other places. Some may have been dumped at Pete's Diner when that oxbow of the Housatonic River was filled in. Is this not why Pyranol contaminated samples show up in unexpected places other than at the plant. When will it get in the drinking water?

You will note from the attached that the total Pyranol in the fifth, sixth, seventh and ninth paragraphs is one to two orders of magnitude greater than in the second and fourth which you have worked on. The 10Ca is all over the U.S.

A real thorough study should be made to at least identify where spent Fullers Earth and discarded Pyranol were dumped. If we do not do that now our children and grand children will get bit by our neglect.

Very truly yours,

R. Kelly Niederjohn
5/15/81

213. GE has known that PCBs are highly toxic for nearly 100 years.

214. In September 1937, Dr. Cecil Drinker, of Harvard University, published an article titled "The Problem of Possible Systemic Effects from Certain Chlorinated Hydrocarbons." Dr. Drinker was hired by Halowax Corporation to investigate mounting health problems among the company's workers who were exposed to PCBs. In this article, Dr. Drinker quoted a conference

that had been held by the Harvard School of Public Health that was attended by representatives of Monsanto and GE. Dr. Drinker wrote: "the chlorinated diphenyl is certainly capable of doing harm in very low concentrations and is probably the most dangerous . . . These experiments leave no doubt as to the possibility of systemic effects from the chlorinated napthalenes and chlorinated diphenyls."

215. At this conference in 1937, a GE Assistant Manager, F.R. Kaimer, documented numerous concerning experiences his workers had had working with PCBs, including the death of one worker.

216. GE previously published its own guidelines regarding PCBs, which state: "**Care should be taken to prevent any entry of this material into the environment through spills, leakage, use, disposal, vaporization, or otherwise**." (emphasis in original).

### C. GE HAS DOWNPLAYED AND MISREPRESENTED HOW SEVERELY GE HAS POLLUTED THE HOUSATONIC RIVER, PITTSFIELD, AND BERKSHIRE COUNTY WITH PCBS

217. In 1990, former GE employees, Ed Bates and Charles Fessenden, were interviewed on film regarding their time at the Pittsfield GE plant.

218. During this interview, Ed Bates stated with regard to the Pittsfield GE plant: "We used to use an average of 20,000 gallons of Pyranol a week. And this is, if you did simple mathematics, this is 140,000 pounds of Pyranol, of PCBs a week that we were handling. And we had a loss rate, spillage, over-filling of about 3% so this says that every week, we would lose between 4,000 and 5,000 pounds of PCBs that would go down the drain and into the river."

219. Despite the fact that—according to Mr. Bates's firsthand knowledge—GE was routinely dumping 16,000 to 20,000 pounds of PCBs per month (*i.e.* 192,000 to 240,000 pounds per year) into the Housatonic River, GE persistently underreported the amounts of PCBs it had dumped into the Housatonic River to numerous governmental agencies, including the EPA and

DEP. Evidencing GE's misrepresentations is a 1982 report from the EPA, which relied on data submitted by GE, which stated that there was only an "estimated total of 22,200 lbs" of PCBs in the Housatonic River.

220. During his 1990 interview, GE employee, Ed Bates, explained that the "Pyranol was manufactured by Monsanto Company and came from Love Canal." Mr. Bates explained that, during the use of the PCBs, the PCBs were placed in "500 gallon cars that were mobile, that moved around but a lot of times you would have a flood or one of the seams would leak or a valve would let go and you would have a spill of maybe a 1,000 or 1,200 gallons of Pyranol, and this would eventually go down to the sump and go out to the river. Well that doesn't sound like much but a 1,000 gallons of Pyranol was . . . 6,000 pounds of PCBs, so we were on a daily basis discharging PCBs in the river."

221. According to Ed Bates, "about a million and a half pounds of PCBs have been plowed into that river."

222. Former Mayor of Pittsfield, Remo DelGallo, was interviewed regarding GE's disposal and dumping of PCBs. Mayor DelGallo stated: "I can go back 50, 60 years if need be that when the General Electric Company had the oil tanks, the oil house up on the northerly side of the railroad tracks next to Peck's Bridge, those tanks leaked for years and years and years and I don't know why they never took corrective measures and the oil flowed down the embankment, under the railroad tracks and then into East Street and what was said created a plume and when they say a plume, they're talking about an underground lake of oil."

223. Mayor DelGallo also stated in this interview: "We saw the oil – there was a tremendous amount of oil even in those days. Now you have to remember, inside the General Electric Company – it's an old plant located in the center of the city of Pittsfield and there were umpteen drains all over the place. And they dumped a voluminous amount of oil in those

drains. Nobody even knew where the drains went. Some leeched into Silver Lake; a good number of them went into the Housatonic River."

224. In 1997, former head of the Pittsfield Department of Public Works, Gerald Doyle Sr., was questioned under oath about how much PCBs GE had previously dumped throughout the City of Pittsfield:

> Q. Were you at any point familiar with how much stuff came out of the General Electric facility and was put in a landfill?
>
> A. A ****load.
>
> Q. What do you mean by that?
>
> A. A bundle.
>
> Q. How many truckloads a day?
>
> A. I would say they would bring in, and I am guessing, maybe six truckloads a day. You know, ten wheeler dump.
>
> Q. Six ten wheeler dump trucks a day.
>
> A. Every.
>
> Q. Every day?
>
> A. Every day.
>
> Q. For the life of the landfill?
>
> A. Yes.

225. During decades "cleanup" efforts by GE—which were really just re-dumping of PCBs—GE gave away barrels of Fuller's Earth (soil drenched with PCBs) to its employees to use in their backyards and at their homes.

226. GE would manipulatively have their employees sign waiver agreements or contracts absolving GE of any liability and misrepresenting that the PCB-laden soil GE was providing to the Pittsfield residents was really "clean fill":

Pittsfield, Massachusetts
April , 1948

I, Melfino Quaglietti, hereby request the General Electric Company, a corporation duly organized and existing under the laws of the State of New York and having its usual place of business in the City of Pittsfield, Massachusetts, to fill with clean, non-combustible material that portion, as designated by me, of the parcel of land situated on Newell Street and Sackett Street obtained by me from Helen S. Wright, widow of Charles A. Wright, by Deed, dated August 12, 1946, and recorded with the Berkshire Middle District Registry of Deeds in Land Court, Book 11, Page 21, Certificate #2012.

I hereby agree to assume all responsibility for any loss or damage to property or persons due to such filling operations herein requested, and I further agree to protect and defend the said General Electric Company from all claims or demands whatsoever and to hold said General Electric Company harmless from any loss or damage.

signed Melfino Quaglietti

COMMONWEALTH OF MASSACHUSETTS)
) ss:
County of Berkshire )

On this day of April, 1948, before me personally appeared Melfino Quaglietti, to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed.

227. In addition to Allendale Elementary School, GE also disposed of PCB waste at the Dorothy Amos Children's Park in Pittsfield.

228. Rather than ship the PCB waste and Fuller's Earth to some protected remote facility, which GE and Monsanto certainly could have afforded to do and should have done,

instead, for years, GE has redistributed and dumped thousands of pounds of PCB waste throughout the City of Pittsfield, further contaminating the community.

229. Due to GE's egregious decades of dumping PCB waste throughout the City of Pittsfield, soil sampling performed by the DEP has revealed a majority of sites (approximately 700), including residential homes, are contaminated with PCBs.

230. Upon discovery of this shocking information, understandably, the community was in an uproar. That is when GE doubled down on its misinformation campaign. To that end, Stephen Ramsey, GE's then vice president of corporate environmental programs, insisted that PCBs are "safe," something that was published on the front page of the *Berkshire Eagle* on April 10, 1998:


'he Berkshire Eagle

PCBs safe, GE will insist

*Company to fight dredging order*

231. GE's dumping in residential neighborhoods was so bad that entire streets began to be remediated:




232. As recently as 2022, a study funded by the NIH titled "PCBs in indoor air and human blood in Pittsfield, Massachusetts" was published in Volume 293 of *Chemosphere*.

233. This study specifically focused on the PCB serum levels in the blood of Pittsfield residents as well as PCB levels found in samples of these residents' basements, living rooms, and outdoor air.

234. The median serum PCB levels in this study were 4.2 ng/g, which is "at least four times the average level in the US population, and consisted primarily of more highly chlorinated, persistent congeners."

235. The study found that these serum PCB levels reflect "contamination with PCBs coming from the local General Electric facility."

236. According to the study, the median basement air concentration of PCBs was 20.3 $ng/m^3$, the median living room air concentration of PCBs was 11.4 $ng/m^3$, and the median outdoor air concentration of PCBs was 3.0 $ng/m^3$.

237. According to this study, "GE made transformers filled with a product named Pyranol that contained [PCBs], which were specially made for GE by the Monsanto Company. Pyranol contained approximately 50% PCBs, 50% trichloroethylene and traces of phenoxypropene oxides and dibenzofurans."

238. As the study explained, during the manufacturing process at the GE plant in Pittsfield, "Fuller's earth was used to purify the Pyranol before use and to scavenge spilled PCBs."

239. As the study recognized, GE gave Fuller's earth "to local homeowners as fill for their yards" and yet more was "dumped into local bodies of water, including the Housatonic River and Silver Lake."

240. As this 2022 study recognized, "significant [PCB] contamination remains" in Pittsfield despite remediation.

241. As the 2022 study recognized, "Pittsfield still has large landfills with PCBs, and air, soil and water still contain high concentrations of PCBs."

242. As the 2022 study stated, "our group has increasingly become concerned about vapor phase PCBs and with inhalation of PCBs as being a significant route of exposure."

243. As the 2022 study stated, "if PCBs are present in air, especially indoor air, the exposure will be continuous and may pose health hazards that are not adequately identified by measurement of more persistent congeners in blood."

244. As this 2022 study concluded, "exposure to PCBs in air is effectively continuous."

245. As the authors of this 2022 study stated, they had previously concluded, based on other studies, that "chronic 'smelling' PCB contaminated oil leads to cancer in individuals with serum elevations of lower chlorinated PCB congeners but background levels of higher chlorinated, not-so volatile congeners."

246. As the 2022 study recounts, "Pittsfield has a long history of PCB contamination resulting from the General Electric plant, which has contaminated the Housatonic River and soil and air throughout the city."

247. As the 2022 study recounts, "[i]n past years many residents were given 'clean' soil as fill for their yards, but it really was Fuller's earth contaminated with PCBs."

248. As the 2022 study recounts, "[t]here are several landfills within the city limits containing dredged material from the river and waste from the plant. A school [Allendale Elementary School] immediately abuts one such landfill."

249. As the 2022 study recounts, "[e]ven after extensive remediation Pittsfield remains a very polluted city."

250. The 2022 study concluded: "The concentration and congener pattern of PCBs found in the air samples, especially in the basement, are striking."

251. The 2022 study concluded: "The finding that the PCB concentrations in basement air are so high suggests that volatile PCBs, like radon, are entering through the foundation and floor."

252. The 2022 study further concluded: "when volatile PCBs are present in indoor air, they are inhaled and absorbed into the body of residents in the homes under study."

253. The 2022 study concluded: "The sum of evidence of hazard from vapor phase PCBs suggests that exposure can lead at least to cancer, cardiovascular disease, diabetes, thyroid disease, reproductive abnormalities and cognitive dysfunction. Because many older buildings, including offices, homes, schools and day cares, contain PCBs in building materials, occupants are inhaling these lower chlorinated PCBs continuously. The situation in Pittsfield is likely more serious than in buildings that are not constructed on highly contaminated soil, but none-the-less our results suggests that indoor concentration of vapor-phase PCBs is a global problem."

## VII. PCBS AND THYROID CANCER

254. According to various medical articles and literature, there is a significant association between PCB exposure and thyroid cancer.

255. In 2016, the International Agency for Research on Cancer ("IARC") classified PCBs as carcinogenic to humans.

256. Numerous medical and scientific studies have demonstrated that PCBs are endocrine-disrupting chemicals that interfere with normal thyroid function and have been associated with an increased risk of thyroid disease and thyroid cancer.

257. Scientific literature has further demonstrated that because PCBs bioaccumulate and persist in the human body for decades, prolonged exposure increases an individual's cumulative risk of adverse health effects, including thyroid cancer.

## VIII. PCBS AND BREAST CANCER

258. According to various medical articles and scientific literature, there is a significant association between PCB exposure and breast cancer.

259. Numerous epidemiological studies have demonstrated that prolonged environmental exposure to PCBs increases the risk of breast cancer, particularly because PCBs accumulate within

human adipose tissue and function as endocrine-disrupting chemicals capable of altering normal hormonal signaling.

260. Scientific literature has demonstrated that PCB exposure contributes to oxidative stress, chronic inflammation, endocrine disruption, cellular injury, and DNA damage, each of which is recognized as contributing to the development and progression of breast cancer.

261. Because PCBs persist in the human body for decades and bioaccumulate over time, individuals exposed during childhood and early adulthood face increased lifetime risks of developing breast cancer.

262. Plaintiff developed breast cancer after decades of repeated exposure to Defendants' PCB contamination while living, attending school, working, and recreating throughout Pittsfield and Berkshire County.

## IX. PCBS, DIOXINS, AND OTHER HAZARDOUS CONTAMINANTS

263. According to various medical articles and literature, there is a significant association between exposure to PCBs and dioxins (of which certain PCBs are a class) and the development of cancer and other serious diseases.

264. As the World Health Organization ("WHO") has stated, certain "dioxin-like polychlorinated biphenyls (PCBs) with similar toxic properties are also included under the term 'dioxins.'" In this same article, the WHO stated: "PCB-based waste is not easily disposed of without contamination of the environment and human populations" and such material "needs to to be treated as hazardous waste and is best destroyed by high temperature incineration in specialised facilities." Soft tissue sarcoma ("STS") has been specifically linked to exposure to dioxins.

265. Hill 78 and Building 71, both of which have been used for decades as toxic waste dumps (immediately abutting Allendale Elementary School) contain not only PCB waste, but also numerous dioxins, furans, and other harmful chemicals, including arsenic and cyanide.

266. As the EPA has stated, Hill 78, which spans approximately 6 acres, was "historically used by GE for excavated soils, building demolition and construction debris, and other materials generated within the GE facility."

267. As the EPA has stated, Building 71 was "designated . . . as a consolidation area for certain materials excavated or otherwise removed as part of various Removal Actions and building demolition activities at the GE Pittsfield/Housatonic River Site."

268. There are numerous groundwater wells that exist on GE property near Hill 78, Building 71, and Allendale Elementary School.

269. Groundwater testing conducted at the direction of GE has repeatedly shown, over a decade, that this groundwater next to and near Hill 78, Building 71, and Allendale Elementary School is contaminated not only with PCBs, but also with various volatile organic compounds, semi-volatile organic compounds, dioxins, furans, and inorganics, including but not limited to arsenic, cyanide, acetone, chloroform, chloromethane, dibromomethane, methylene chloride, toluene, bis(2-Ethylhexyl)phthalate, Dimethylphthalate, Di-n-Butylphthalate, Naphthalene, 2, 3, 7, 8 – Tetrachlorodibenzofuran, 2, 3, 7, 8 – Tetrachlorodibenzo-p-dioxin, 1, 2, 3, 7, 8-PeCDF, 2, 3, 4, 7, 8-PeCDF, 1, 2, 3, 4, 7, 8-HxCDF, 1, 2, 3, 6, 7, 8-HxCDF, 1, 2, 3, 7, 8, 9-HxCDF, 2, 3, 4, 6, 7, 8-HxCDF, 1, 2, 3, 4, 6, 7, 8-HpCDF, 1, 2, 3, 4, 7, 8, 9-HpCDF, OCDF, TCDDs, 1, 2, 3, 7, 8-PeCDD, 1, 2, 3, 4, 7, 8-HxCDD, 1, 2, 3, 6, 7, 8-HxCDD, 1, 2, 3, 7, 8, 9-HxCDD, 1, 2, 3, 4, 6, 7, 8-HpCDD, antimony, barium, cadmium, calcium, chromium, cobalt, copper, lead, magnesium, manganese, nickel, selenium, silver, sodium, sulfide, vanadium, zinc, and beryllium.

270. This groundwater testing is reflective of the mass contamination of materials that defendant GE has intentionally dumped throughout Pittsfield, for years, containing various volatile organic compounds, semi-volatile organic compounds, dioxins, furans, and inorganics, including but not limited to arsenic, cyanide, acetone, chloroform, chloromethane, dibromomethane, methylene

chloride, toluene, bis(2-Ethylhexyl)phthalate, Dimethylphthalate, Di-n-Butylphthalate, Naphthalene, 2, 3, 7, 8 – Tetrachlorodibenzofuran, 2, 3, 7, 8 – Tetrachlorodibenzo-p-dioxin, 1, 2, 3, 7, 8-PeCDF, 2, 3, 4, 7, 8-PeCDF, 1, 2, 3, 4, 7, 8-HxCDF, 1, 2, 3, 6, 7, 8-HxCDF, 1, 2, 3, 7, 8, 9-HxCDF, 2, 3, 4, 6, 7, 8-HxCDF, 1, 2, 3, 4, 6, 7, 8-HpCDF, 1, 2, 3, 4, 7, 8, 9-HpCDF, OCDF, TCDDs, 1, 2, 3, 7, 8-PeCDD, 1, 2, 3, 4, 7, 8-HxCDD, 1, 2, 3, 6, 7, 8-HxCDD, 1, 2, 3, 7, 8, 9-HxCDD, 1, 2, 3, 4, 6, 7, 8-HpCDD, antimony, barium, cadmium, calcium, chromium, cobalt, copper, lead, magnesium, manganese, nickel, selenium, silver, sodium, sulfide, vanadium, zinc, and beryllium.

271. The volatile organic compounds, semi-volatile organic compounds, dioxins, furans, and inorganics, present on GE's and SABIC's property that defendant GE has dumped throughout Pittsfield, including but not limited to arsenic, cyanide, acetone, chloroform, chloromethane, dibromomethane, methylene chloride, toluene, bis(2-Ethylhexyl)phthalate, Dimethylphthalate, Di-n-Butylphthalate, Naphthalene, 2, 3, 7, 8 – Tetrachlorodibenzofuran, 2, 3, 7, 8 – Tetrachlorodibenzo-p-dioxin, 1, 2, 3, 7, 8-PeCDF, 2, 3, 4, 7, 8-PeCDF, 1, 2, 3, 4, 7, 8-HxCDF, 1, 2, 3, 6, 7, 8-HxCDF, 1, 2, 3, 7, 8, 9-HxCDF, 2, 3, 4, 6, 7, 8-HxCDF, 1, 2, 3, 4, 6, 7, 8-HpCDF, 1, 2, 3, 4, 7, 8, 9-HpCDF, OCDF, TCDDs, 1, 2, 3, 7, 8-PeCDD, 1, 2, 3, 4, 7, 8-HxCDD, 1, 2, 3, 6, 7, 8-HxCDD, 1, 2, 3, 7, 8, 9-HxCDD, 1, 2, 3, 4, 6, 7, 8-HpCDD, antimony, barium, cadmium, calcium, chromium, cobalt, copper, lead, magnesium, manganese, nickel, selenium, silver, sodium, sulfide, vanadium, zinc, and beryllium, are carcinogenic, toxic, dangerous, and/or hazardous to human health.

272. Plaintiff, Virginia Crocker-Timmins, was born in Pittsfield, Massachusetts, and grew up at 136 Elberon Avenue in Pittsfield, where she resided throughout her childhood and early adulthood.

273. Plaintiff lived, attended school, worked, and spent decades in Pittsfield and Berkshire County during the period in which Defendants knowingly manufactured, used, released, dumped, and allowed PCB contamination to permeate the community.

274. Plaintiff attended Allendale Elementary School, North Junior High School, and Pittsfield High School and later worked for GE Aerospace during college breaks in 1985 and 1986 before becoming a full-time

employee from 1987 through 1995, all while Defendants' PCB contamination existed throughout Pittsfield and Berkshire County.

275. Plaintiff lived in close proximity to and spent a substantial amount of time over the course of decades in and around, numerous areas of Pittsfield and Berkshire County contaminated with PCBs, including areas surrounding the Pittsfield GE plant, Silver Lake, the Housatonic River, and other locations polluted by Defendants' decades-long dumping, release, use, and disposal of PCBs.

276. Previous levels of PCBs sampled in sediments of Silver Lake were as high as 30,689 parts per million ("ppm")—an astronomically dangerous level of PCB contamination.

277. As the EPA has stated: "Silver Lake has a history of extensive contamination."

278. Silver Lake is directly connected to the Housatonic River and is in close proximity to the Pittsfield GE plant.

279. There have been "WARNING" and "NO TRESPASSING" signs next to Silver Lake stating: "PCBs present in Silver Lake in concentrations that may be harmful to humans."

280. Defendant GE repeatedly and continuously dumped PCBs directly into Silver Lake.

281. As a direct factual and proximate cause of the negligence, recklessness, nuisance, breach of warranty, fraud, and wrongful conduct of Defendants and their agents, as stated throughout this Complaint, Plaintiff, Virginia Crocker-Timmins, has suffered the following injuries and damages:

a. Papillary thyroid cancer;
b. Breast cancer;
c. Total thyroidectomy;
d. Radioactive iodine therapy;
e. Multiple breast lumpectomies;
f. Radiation therapy;
g. Hysterectomy and bilateral oophorectomy;
h. Numerous biopsies, mammograms, ultrasounds, CT scans, MRIs, and other diagnostic testing;

i. Lifelong thyroid hormone replacement therapy and ongoing medical treatment;

j. Past and future physical pain and suffering;

k. Past and future psychological pain and suffering;

l. Past incurred medical expenses and future medical expenses;

m. Past and future loss of income and earning capacity;

n. Past and future loss of life's pleasures;

o. Past and future emotional distress;

p. Past and future embarrassment;

q. Past and future humiliation; and

r. All damages allowable under the law.

282. Plaintiff's injuries and damages were caused solely by the negligence, recklessness, nuisance, breach of warranty, fraud, and wrongful conduct of the Defendants and their agents and employees, as set forth throughout this Complaint.

## X. CLAIMS AND CAUSES OF ACTION

### COUNT I –NEGLIGENCE
### PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG

283. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

284. The negligent acts and omissions of defendants, Monsanto Company, Solutia Inc., Pharmacia LLC, and Bayer AG, consisted of one or more of the following:

a) Selling PCBs;

b) Manufacturing PCBs;

c) Improperly disposing of PCBs;

d) Distributing PCBs despite knowing of the risks and dangers of PCBs to the environment and human health;

e) Concealing facts about the risks and dangers of PCBs to the environment and human health;

f) Failure to warn customers and consumers, including GE and SABIC, about all of the risks and dangers that PCBs pose to the environment and human health;

g) Failure to warn customers and consumers, including GE and SABIC, about the carcinogenic properties and carcinogenicity of PCBs;

h) Failure to warn customers and consumers, including GE and SABIC, about the teratogenicity of PCBs;

i) Failing to consider, test for, evaluate, or assess all of the dangerous, toxic, cancerous, and harmful properties of PCBs prior to distributing and selling PCBs;

j) Failing to adequately warn the public, including plaintiff, about the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs;

k) Failure to adequately warn customers and consumers, including GE and SABIC, about the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCB;

l) Failing to timely stop manufacturing and selling PCBs;

m) Failure to use reasonable care in designing a chemical (PCBs) that is reasonably safe;

n) Failure to provide warnings regarding the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs after manufacture;

o) Failing to recall PCBs;

p) Affirmatively downplaying, dismissing, ignoring, and misrepresenting information about the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCB;

q) Failure to timely, adequately, and properly remediate, clean up, or attempt to remediate and clean up its PCB contamination throughout the City of Pittsfield, Berkshire County, Housatonic River, and Allendale School;

r) Failure to adequately assist GE and/or SABIC in timely and thoroughly cleaning up and remediating PCB contamination throughout the City of Pittsfield, Berkshire County, Housatonic River, and Allendale School;

s) Placing profit motive and financial interests above safety in knowingly deciding to continue to market and sell PCBS despite having actual knowledge of the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCB;

t) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1937, that these defendants knew that "prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects";

u) Failure to remove or eliminate all PCBs from Pittsfield;

v) Failure to remove or eliminate all PCBs from Berkshire County;

w) Failure to remove or eliminate all PCBs from the Allendale Elementary School property;

x) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1955, that these defendants "know" that PCBs "are toxic";

y) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1955, that these defendants knew PCBs are "quite toxic materials by ingestion or inhalation";

z) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1966 or 1967, that these defendants knew PCBs appeared "to be the most injurious chlorinated compounds of all tested";

aa) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1969, that these defendants knew PCBs are "a pollutant" and "a toxic substance—with no permissible allowable levels";

bb) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1969, that these defendants knew they would "have to restrict uses [of PCBs] and clean-up as much as we can, starting immediately";

cc) Failing to remediate and cleanup the PCB contamination of Pittsfield, Berkshire County, Allendale School, and Housatonic River despite knowing, as far back as 1969, that these defendants "have to restrict uses [of PCBs] and clean-up as much as we can, starting immediately";

dd) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1969, that these defendants knew "PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated";

ee) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1969, that these defendants knew "<u>there is an important environmental quality problem involved in wastes of PCB</u>";

ff) Continuing to manufacture, sell, and distribute PCBs after acknowledging, as far back as 1969, that these defendants knew "the evidence regarding PCB effects on environmental quality is sufficiently substantial, widespread, and alarming to require immediate corrective action on the part of Monsanto"; and

gg) Continuing to manufacture, sell, and distribute PCBs because “there is too much customer/market need and selfishly too much Monsanto profit to go out” even though these defendants knew PCBs are toxic and dangerous to human being.

285. As a direct and proximate cause of the negligence of defendants, Monsanto Company, Solutia Inc., Pharmacia LLC, and Bayer AG, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT II – STRICT LIABILITY (DESIGN DEFECT)**
**PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

286. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

287. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG were the manufacturers of PCBs.

288. These defendants defectively designed PCBs (also known as Aroclors and Pyranol) because the gravity of danger posed by PCBs is substantial, including numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings, including children.

289. The likelihood of danger occurring due to the numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings posed by PCBs is and was at all times a guaranteed certainty, and defendants, Monsanto, Solutia, Pharmacia, and Bayer AG at all times knew this and have known this.

290. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG had at their disposal feasible alternative chemicals, methods, and solutions other than PCBs that were safer than PCBs. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG had an available design

modification through use of these alternative chemicals, methods, and solutions that would have reduced the risks posed by PCBs without undue cost or interference with the performance of the products.

291. At all times, PCBs were unreasonably dangerous because PCBs, due to their numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous properties, are dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

292. At all times, the PCBs were unreasonably dangerous due to the defects in the design of the PCBs.

293. At all times, PCBs were unreasonably dangerous because PCBs lacked adequate warnings to communicate the nature, gravity, and severity of all of the many toxic, carcinogenic, teratogenic, hazardous, and dangerous properties of PCBs.

294. As a direct factual and proximate cause of the defective design of the PCBs that were manufactured by defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT III – STRICT LIABILITY (DESIGN DEFECT)**
**PLAINTIFF v. GE, SABIC, MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

295. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

296. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG were the manufacturers of PCBs.

297. At all times, defendants, GE, SABIC (by way of assumption of GE's liabilities),

Monsanto, Solutia, Pharmacia, and Bayer AG (by way of assumption of Monsanto's liabilities), manufactured Pyranol, which consisted of the creation and manufacturing of 50% PCBs plus 50% trichloroethylene and traces of phenoxypropene oxides and dibenzofurans.

298. These defendants defectively designed Pyranol because the gravity of danger posed by Pyranol is substantial, including numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings, including children.

299. The likelihood of danger occurring due to the numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings posed by Pyranol is and was at all times a guaranteed certainty, and defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG at all times knew this and have known this.

300. At all times, defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG had at their disposal feasible alternative chemicals, methods, and solutions other than Pyranol that were safer than Pyranol. At all times, defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG had an available design modification through use of these alternative chemicals, methods, and solutions that would have reduced the risks posed by Pyranol without undue cost or interference with the performance of the products.

301. At all times, Pyranol was unreasonably dangerous because Pyranol, due to its numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous properties, is dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

302. At all times, Pyranol was unreasonably dangerous due to the defects in the design of Pyranol.

303. At all times, Pyranol was unreasonably dangerous because Pyranol lacked adequate warnings to communicate the nature, gravity, and severity of all of the many toxic, carcinogenic, teratogenic, hazardous, and dangerous properties of Pyranol.

304. As a direct factual and proximate cause of the defective design of the Pyranol that was manufactured by defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT IV – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

305. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

306. Goods, including PCBs, must be fit for the ordinary purposes for which such goods are used.

307. When a defendant sells or distributes a product that is not fit for the ordinary purposes for which such goods are used, that is a breach of the implied warranty of merchantability. Sale or distribution of unreasonably dangerous goods constitutes a breach of the implied warranty of merchantability.

308. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG were the manufacturers of PCBs.

309. These defendants defectively designed PCBs (also known as Aroclors and Pyranol) because the gravity of danger posed by PCBs is substantial, including numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings, including children.

310. The likelihood of danger occurring due to the numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings posed by PCBs is and was at all times a guaranteed certainty, and defendants, Monsanto, Solutia, Pharmacia, and Bayer AG at all times knew this and have

known this.

311. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG had at their disposal feasible alternative chemicals, methods, and solutions other than PCBs that were safer than PCBs. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG had an available design modification through use of these alternative chemicals, methods, and solutions that would have reduced the risks posed by PCBs without undue cost or interference with the performance of the products.

312. At all times, PCBs were unreasonably dangerous because PCBs, due to their numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous properties, are dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

313. At all times, the PCBs were unreasonably dangerous due to the defects in the design of the PCBs.

314. At all times, PCBs were unreasonably dangerous because PCBs lacked adequate warnings to communicate the nature, gravity, and severity of all of the many toxic, carcinogenic, teratogenic, hazardous, and dangerous properties of PCBs

315. As a direct factual and proximate cause of the breach of implied warranty of merchantability relating to the PCBs that were manufactured and sold by defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT V – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

316. The preceding paragraphs of this Complaint are incorporated as though fully set forth

herein.

317. Goods, including Pyranol, must be fit for the ordinary purposes for which such goods are used.

318. When a defendant sells or distributes a product that is not fit for the ordinary purposes for which such goods are used, that is a breach of the implied warranty of merchantability. Sale or distribution of unreasonably dangerous good constitutes a breach of the implied warranty of merchantability.

319. At all times, defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG were the manufacturers of Pyranol.

320. These defendants defectively designed Pyranol because the gravity of danger posed by Pyranol is substantial, including numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings, including children.

321. The likelihood of danger occurring due to the numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous effects on human beings posed by Pyranol is and was at all times a guaranteed certainty, and defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG at all times knew this and have known this.

322. At all times, defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG had at their disposal feasible alternative chemicals, methods, and solutions other than Pyranol that were safer than Pyranol. At all times, defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG had an available design modification through use of these alternative chemicals, methods, and solutions that would have reduced the risks posed by Pyranol without undue cost or interference with the performance of the products.

323. At all times, Pyranol was unreasonably dangerous because Pyranol, due to its numerous toxic, carcinogenic, teratogenic, hazardous, and dangerous properties, is dangerous

to an extent beyond that which would be contemplated by the ordinary consumer.

324. At all times, the Pyranol was unreasonably dangerous due to the defects in the design of the Pyranol.

325. At all times, Pyranol was unreasonably dangerous because Pyranol lacked adequate warnings to communicate the nature, gravity, and severity of all of the many toxic, carcinogenic, teratogenic, hazardous, and dangerous properties of Pyranol.

326. As a direct factual and proximate cause of the breach of implied warranty of merchantability relating to the Pyranol that was manufactured and sold by defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT VI – NEGLIGENCE**
**PLAINTIFF v. GE AND SABIC**

327. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

328. The negligent acts and omissions of defendants, GE and SABIC, consisted of one or more of the following:

a. Intentionally dumping PCBs into the Housatonic River for decades;

b. Intentionally disposing of and dumping PCBs and Fuller's earth at various places throughout the City of Pittsfield;

c. Intentionally disposing of PCBs at Allendale Elementary School;

d. Providing PCBs and Fuller's earth to the City of Pittsfield knowing that the PCBs and Fuller's earth would be used to layer a children's elementary school;

e. Providing PCBs and Fuller's earth to the City of Pittsfield knowing that the PCBs and Fuller's earth would be used to layer a children's elementary school playground;

f. Concealing facts about the risks and dangers of PCBs to the environment and human health;

g. Failure to warn the public, community, customers, and neighbors, including plaintiff, about the carcinogenic, teratogenicity, toxic, hazardous, dangerous, and harmful properties of PCBs;

h. Failing to consider, test for, evaluate, or assess all of the dangerous, toxic, cancerous, and harmful properties of PCBs prior to dumping and disposing of PCBs throughout Pittsfield, including at Allendale Elementary School;

i. Failing to warn property owners about the dangerous, toxic, cancerous, and harmful properties of PCBs and Fuller's earth prior to selling and/or providing the PCBs and Fuller's earth to these property owners to be used at their homes and on their land;

j. Failing to timely stop dumping PCBs throughout Pittsfield;

k. Failing to timely stop disposing of PCBs into the Housatonic River;

l. Failing to properly communicate with defendants, Monsanto, Solutia, Pharmacia, and Bayer AG about the dangerous, toxic, teratogenic, cancerous, and harmful properties of PCBs;

m. Failure to provide warnings regarding the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs after manufacture;

n. Failing to properly remediate PCB damage and contamination throughout Pittsfield;

o. Failure to properly remediate PCB damage and contamination in the Housatonic River;

p. Affirmatively downplaying, dismissing, ignoring, and misrepresenting information about the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs;

q. Making patently false statements to the public, including through the *Berkshire Eagle*, directly downplaying, dismissing, ignoring, and misrepresenting information about the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs;

r. Continuing to use PCBs in the manufacturing process despite knowing that PCBs possessed substantial risks, dangers, toxicity, carcinogenicity, and teratogenicity;

s. Failing to properly maintain PCB remediation sites and dumping sites throughout Pittsfield so as to prevent the further transmission of PCBs throughout the air, water, and environment;

t. Failure to properly construct and procure adequate devices, controls, grading, gradient, capping, equipment, and systems at PCB remediation sites and dumping sites throughout Pittsfield so as to prevent the further transmission of PCBs throughout the air, water, and environment;

u. Failure to timely, adequately, and properly remediate, clean up, or attempt to remediate and clean up its PCB contamination throughout the City of Pittsfield, Berkshire County, Housatonic River, and Allendale School;

v. Failure to remove or eliminate all PCBs from Pittsfield;

w. Failure to remove or eliminate all PCBs from Berkshire County;

x. Failure to remove or eliminate all PCBs from the Allendale Elementary School property;

y. Placing profit motive and financial interests above safety in knowingly deciding to continue to use PCBs despite having actual knowledge of the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCB.

329. As a direct and proximate cause of the negligence of defendants, GE and SABIC, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT VII – FRAUD**
**PLAINTIFF v. GE AND SABIC**

330. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

331. For decades, defendants, GE and SABIC, have fraudulently misrepresented the dangers and harm posed by PCBs to the public and community, including plaintiff.

332. For example, defendants, GE and SABIC, by and through their agents and representatives, have repeatedly stated to the public and residents of Pittsfield, including plaintiff, that PCBs are "safe" despite knowing this is not true.

333. Defendants, GE and SABIC, by and through their agents and representatives, have repeatedly stated to the public and residents of Pittsfield, including plaintiff, that "[w]e haven't proven PCBs even harm anyone" despite knowing this is not true.

334. Defendants, GE and SABIC, by and through their agents and representatives, have repeatedly stated to the public and residents of Pittsfield, including plaintiff, that GE does not believe PCBs harm people, despite knowing this is not true.

335. Defendants, GE and SABIC, by and through their agents and representatives, have repeatedly stated to the public and residents of Pittsfield, including plaintiff, that GE does "not believe that there are any significant adverse health effects from PCBs" despite knowing this is not true.

336. Defendants, GE and SABIC, by and through their agents and representatives, have repeatedly stated to the public and residents of Pittsfield, including plaintiff, that there are no studies that have proven that PCBs are harmful despite knowing this is not true.

337. Defendants, GE and SABIC, by their repeated false statements about the dangers of PCBs, have routinely engaged in a systematic and intentional misinformation campaign designed to placate the residents of Pittsfield about the dangers of PCBs so that the full and true extent of defendants' abhorrent conduct and decimation of the health and wellbeing of the residents of Pittsfield will not come to light.

338. These statements made by defendants, GE and SABIC, constitute false representations of material facts with GE's and SABIC's knowledge of the falsity of the statements.

339. Defendants, GE and SABIC, have persistently, routinely, and fraudulently concealed material facts regarding the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs from the public, including plaintiff.

340. These fraudulent statements made by defendants, GE and SABIC, were made for the purpose of inducing members of the public, including plaintiff, to act thereon.

341. These fraudulent statements made by defendants, GE and SABIC, were made to include the public, including plaintiff, to refrain from acting and refrain from investigating or discovering the true nature and extent of the dangers of PCBs and the misconduct of the defendants.

342. Plaintiff has relied on these fraudulent statements made by defendants, GE and SABIC as true and have acted upon it to the detriment, harm, and damage to the plaintiff.

343. As a direct and proximate cause of the fraud of defendants, GE and SABIC, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT VIII – FRAUD**
**PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

344. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

345. For decades, defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, have fraudulently misrepresented the dangers and harm posed by PCBs to the public and community, including plaintiff.

346. Defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, by and through their agents and representatives, have repeatedly stated to the public, including plaintiff, that PCBs are safe despite knowing this is not true.

347. Defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, by and through their agents and representatives, have repeatedly misrepresented, hidden, manipulated, and misstated the import and meaning of scientific and medical literature and data regarding the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs.

348. Defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, by their repeated false statements about the dangers of PCBs, have routinely engaged in a systematic and intentional misinformation campaign designed to placate the residents of Pittsfield about the dangers of PCBs so that the full and true extent of defendants' abhorrent conduct and decimation of the health and wellbeing of the residents of Pittsfield will not come to light.

349. These statements made by defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, constitute false representations of material facts with Monsanto, Solutia, Pharmacia, and

Bayer AG's knowledge of the falsity of the statements.

350. Defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, have persistently, routinely, and fraudulently concealed material facts regarding the risks, dangers, toxicity, carcinogenicity, and teratogenicity of PCBs from the public, including plaintiff.

351. These fraudulent statements made by defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, were made for the purpose of inducing members of the public, including plaintiff, to act thereon.

352. These fraudulent statements made by defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, were made to include the public, including plaintiff, to refrain from acting and refrain from investigating or discovering the true nature and extent of the dangers of PCBs and the misconduct of the defendants.

353. Plaintiff has relied on these fraudulent statements made by defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, true and have acted upon it to the detriment, harm, and damage to the plaintiff.

354. As a direct and proximate cause of the fraud of defendants, Monsanto, Solutia, Pharmacia, and Bayer AG, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT IX – PRIVATE NUISANCE**
**PLAINTIFF v. GE AND SABIC**

355. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

356. At all times relevant hereto, the property upon which the Pittsfield GE plant was operated where PCBs were stored, used, maintained, disposed of, and dumped, was owned by defendants, GE and/or SABIC.

357. By their misconduct and improper actions with respect to their use, misuse, dumping, failure to remove, failure to remediate, disposal, and distribution of PCBs and Pyranol, as outlined throughout the entirety of this complaint, defendants, GE and SABIC, have created, permitted, and maintained a condition or activity on these defendants' property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another, including the property of plaintiff and the property of Allendale Elementary School.

358. Due to the private nuisance created by defendants, GE and SABIC, defendants' nuisance has deprived plaintiff, City of Pittsfield, and Allendale Elementary School, of the exclusive right to enjoy the use of their premises free from material disturbance and annoyance.

359. The private nuisance of the defendants, GE and SABIC, has been and continues to be a substantial interference with the ordinary comfort of human existence.

360. The private nuisance of the defendants, GE and SABIC, has been and continues to be substantially detrimental to the reasonable use or value of the property.

361. At all times, the gravity of harm caused by the conduct of defendants, GE and SABIC, has outweighed the utility of their conduct.

362. At all times, defendants, GE and SABIC, were able to reduce or eliminate the harm caused by their use, misuse, dumping, failure to remove, failure to remediate, disposal, and distribution of PCBs and Pyranol, without undue hardship.

363. The conduct of defendants, GE and SABIC, has at all times constituted a continuing nuisance because these defendants' use, misuse, dumping, failure to remove, failure to remediate, disposal, and distribution of PCBs and Pyranol has invaded the property rights of plaintiff, City of Pittsfield, and Allendale Elementary School, because of repeated and recurring wrongs, exposures, contaminations, disposals, and dumpings, which has resulted in new harm to these properties on each occasion.

364. As a direct and proximate cause of the private nuisance of defendants, GE and SABIC, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT X – PUBLIC NUISANCE**
**PLAINTIFF v. GE AND SABIC**

365. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

366. At all times relevant hereto, the property upon which the Pittsfield GE plant was operated where PCBs were stored, used, maintained, disposed of, and dumped, was owned by defendants, GE and/or SABIC.

367. By their misconduct and improper actions with respect to their use, misuse, dumping, failure to remove, failure to remediate, disposal, and distribution of PCBs and Pyranol, as outlined throughout the entirety of this complaint, defendants, GE and SABIC, have created, permitted, and maintained a condition or activity on these defendants' property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another, including the property of plaintiff and the property of Allendale Elementary School.

368. Due to the private nuisance created by defendants, GE and SABIC, defendants' nuisance has deprived plaintiff, City of Pittsfield, and Allendale Elementary School, of the exclusive right to enjoy the use of their premises free from material disturbance and annoyance.

369. The private nuisance of the defendants, GE and SABIC, has been and continues to be a substantial interference with the ordinary comfort of human existence.

370. The private nuisance of the defendants, GE and SABIC, has been and continues to be substantially detrimental to the reasonable use or value of the property.

371. At all times, the gravity of harm caused by the conduct of defendants, GE and SABIC, has outweighed the utility of their conduct.

372. At all times, defendants, GE and SABIC, were able to reduce or eliminate the harm caused by their use, misuse, dumping, failure to remove, failure to remediate, disposal, and distribution of PCBs and Pyranol, without undue hardship.

373. The conduct of defendants, GE and SABIC, has at all times constituted a continuing nuisance because these defendants' use, misuse, dumping, failure to remove, failure to remediate, disposal, and distribution of PCBs and Pyranol has invaded the property rights of plaintiff, City of Pittsfield, and Allendale Elementary School, because of repeated and recurring wrongs, exposures, contaminations, disposals, and dumping, which has resulted in new harm to these properties on each occasion.

374. The nuisance of the defendants described throughout the Complaint has interfered with the exercise of a public right by directly encroaching on public property, including but not limited to the City of Pittsfield and Allendale Elementary School.

375. The nuisance of the defendants described throughout the Complaint has caused a common injury.

376. As a direct and proximate cause of the public nuisance of defendants, GE and SABIC, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT XI – STRICT LIABILITY (ULTRAHAZARDOUS ACTIVITY)**
**PLAINTIFF v. GE AND SABIC**

377. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

378. At all times, due to their inherently dangerous, volatile, toxic, carcinogenic, and teratogenic nature, PCBs were likely to do mischief and cause harm if they were released from or escaped the GE and SABIC plants, facilities, and property in Pittsfield.

379. At all times, defendants, GE and SABIC, conducted an ultrahazardous activity by storing, keeping, maintaining, using, and/or disposing of PCBs on their property.

380. Even when used perfectly properly and exactly as intended, PCBs are nevertheless toxic, dangerous, volatile, carcinogenic, and teratogenic in nature to those who are exposed to them through many methods of entry, including inhalation, ingestion, and dermal contact.

381. PCBs, a manmade chemical with ultrahazardous properties, is an extraordinary, abnormally, and inherently dangerous material even when used and handled with the utmost care.

382. The use, disposal, storing, keeping, and/or maintaining of PCBs, which defendants did, involves a high degree of risk of harm to others, including plaintiff, because PCBs are inherently toxic, dangerous, volatile, carcinogenic, and teratogenic.

383. The gravity of harm posed by PCBs is always likely to be great because, due to being inherently toxic, dangerous, volatile, carcinogenic, and teratogenic, PCBs cause various forms of cancer, birth defects, reproductive issues, neurologic injury, gastrointestinal problems, and cognitive damage to those who come into contact with even very "low" levels of PCBs.

384. The risks of PCBs cannot be eliminated by the exercise of reasonable care. Look no further than Pittsfield. Surely, in this action, defendants will argue they exercised reasonable care at all times. They did not. However, if the jury were to agree with defendants, then the resulting harm caused here to plaintiff and the community of Pittsfield is proof positive that the risks of PCBs cannot be eliminated by the exercise of reasonable care. No matter how they are used, disposed of, or handled, PCBs travel, never degrade or degrade extremely slowly over hundreds of years, are stored indefinitely in the fatty tissues of mammals, and cause devastating health effects through multiple routes of exposure.

385. The use, disposal, storing, keeping, and/or maintaining of PCBs is not a matter of common usage. Though done for decades by defendants, the use, disposal, storing, keeping, and/or maintaining of PCBs is not generally a common practice among responsible corporate actors.

386. The activity in question—the use, disposal, storing, keeping, and/or maintaining of PCBs—was at all times inappropriate to be carried on where it was by defendants. There are numerous children and residents, as well as schools, stores, and hospitals, in the

communities and neighborhoods extremely close by where defendants used, disposed of, stored, kept, and maintained PCBs for decades. These PCBs were always highly susceptible, due to natural air volatilization, rainwater, runoff, and routine weather patterns, to be transmitted and released out into the public through waterways, ground, and air, which in fact occurred and is ongoing.

387. The activity in question—the use, disposal, storing, keeping, and/or maintaining of PCBs—had no value to the community. Whatever marginal value the community may have gained decades ago from the economic opportunity provided by GE pales in comparison to being permanently poisoned by a forever chemical that has infiltrated the bodies, blood, and airway of Pittsfield and Berkshire County residents. That is no bargain.

388. The widespread and dangerous dissemination of, escape of, release of, and contamination by PCBs is uncontrollable and inevitable even when all reasonable care is applied.

389. The risk posed by the use, disposal, storing, keeping, and/or maintenance of PCBs is so serious that the magnitude of harm posed by this activity justifies imposition of strict liability even if carried on with all reasonable care.

390. As a direct and proximate cause of the strict liability for the ultrahazardous activity carried on by defendants, GE and SABIC, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**<u>COUNT XII – STRICT LIABILITY (ULTRAHAZARDOUS ACTIVITY)</u>**
**PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

391. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

392. At all times, due to their inherently dangerous, volatile, toxic, carcinogenic, and teratogenic nature, PCBs were likely to do mischief and cause harm if they were released from or escaped the property, possession, and control of defendants, Monsanto, Solutia, Pharmacia, and Bayer.

393. At all times, defendants, Monsanto, Solutia, Pharmacia, and Bayer, conducted an ultrahazardous activity by storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs in and around Berkshire County, including Pittsfield and the facilities, plants, and property of defendants, GE and SABIC.

394. Even when used perfectly properly and exactly as intended, PCBs are nevertheless toxic, dangerous, volatile, carcinogenic, and teratogenic in nature to those who are exposed to them through many methods of entry, including inhalation, ingestion, and dermal contact.

395. PCBs, a manmade chemical with ultrahazardous properties, is an extraordinary, abnormally, and inherently dangerous material even when used and handled with the utmost care.

396. The storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs, which defendants did, involves a high degree of risk of harm to others, including plaintiff, because PCBs are inherently toxic, dangerous, volatile, carcinogenic, and teratogenic.

397. The gravity of harm posed by PCBs is always likely to be great because, due to being inherently toxic, dangerous, volatile, carcinogenic, and teratogenic, PCBs cause various

forms of cancer, birth defects, reproductive issues, neurologic injury, gastrointestinal problems, and cognitive damage to those who come into contact with even very "low" levels of PCBs.

398. The risks of PCBs cannot be eliminated by the exercise of reasonable care. Look no further than Pittsfield. Surely, in this action, defendants will argue they exercised reasonable care at all times. They did not. However, if the jury were to agree with defendants, then the resulting harm caused here to plaintiff and the community of Pittsfield is proof positive that the risks of PCBs cannot be eliminated by the exercise of reasonable care. No matter how they are used, disposed of, or handled, PCBs travel, never degrade or degrade extremely slowly over hundreds of years, are stored indefinitely in the fatty tissues of mammals, and cause devastating health effects through multiple routes of exposure.

399. The widespread and dangerous dissemination of, escape of, release of, and contamination by PCBs is uncontrollable and inevitable even when all reasonable care is applied.

400. The storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs is not a matter of common usage. Though done for decades by defendants, the use storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs is not generally a common practice among responsible corporate actors.

401. The activity in question—the storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs—was at all times inappropriate to be carried on where it was by defendants. There are numerous children and residents, as well as schools, stores, and hospitals, in the communities and neighborhoods extremely close by where defendants stored, kept, maintained, used, transported, dropped off, delivered, distributed, and/or disposed of PCBs for decades. These PCBs were always highly susceptible, due to natural air volatilization, rainwater, runoff, and routine weather patterns, to be transmitted and released out

into the public through waterways, ground, and air, which in fact occurred and is ongoing.

402. The activity in question—the storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs—had no value to the community. Whatever marginal value the community may have gained decades ago from PCBs pales in comparison to being permanently poisoned by a forever chemical that has infiltrated the bodies, blood, and airway of Pittsfield and Berkshire County residents. That is no bargain.

403. The risk posed by the defendants' storing, keeping, maintaining, using, transporting, dropping off, delivering, distributing, and/or disposing of PCBs is so serious that the magnitude of harm posed by this activity justifies imposition of strict liability even if carried on with all reasonable care.

404. As a direct and proximate cause of the strict liability for the ultrahazardous activity carried on by defendants, Monsanto, Solutia, Pharmacia, and Bayer, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

## COUNT XIII – VIOLATION OF THE MASSACHUSETTS OIL AND HAZARDOUS MATERIAL RELEASE PREVENTION AND RESPONSE ACT, G.L. c. 21E PLAINTIFF v. GE AND SABIC

405. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

406. At all times material hereto, defendants, GE and SABIC, by contract, agreement, or otherwise, directly and/or indirectly, arranged for the transport, storage and/or treatment of PCBs to or in a site or vessel from or at which there is or has been a release of PCBs.

407. At all times material hereto, defendants GE and SABIC, directly and/or indirectly transported PCBs, which are a hazardous material, to transport, disposal, storage and/or treatment vessels or sites from or at which there is and has been, and to this day continues to be, releases of PCBs and the threat of release of PCBs, which are a hazardous material.

408. At all times material hereto, defendants GE and SABIC, have been and are caused and are legally responsible for the release of PCBs in the public and community, including Pittsfield and throughout Berkshire County.

409. At all times material hereto, defendants GE and SABIC, have been and are caused and are legally responsible for the threat of release of PCBs in the public and community, including Pittsfield and throughout Berkshire County.

410. PCBs are hazardous material, in fact, and as defined by the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G.L. c. 21E.

411. For decades, and up until this day, there have been and are currently releases of hazardous PCBs from sites and/or vessels over which defendants, GE and SABIC, have possession and control.

412. As alleged throughout the complaint, for decades, defendants GE and SABIC, transported, arranged for transport, stored, treated, and released PCBs, which are a hazardous material, to and from defendants, Monsanto, Bayer, Pharmacia, and Solutia. Defendants, Monsanto, Bayer, Pharmacia, and Solutia, and defendants, GE and SABIC, had and have had a continuous and circular stream of transportation, storage, treatment, and release of PCBs to and from the Pittsfield plants, facilities, and dumping sites, as alleged throughout this complaint.

413. Defendants, GE and SABIC, for decades, used various vehicles, trucks, automobiles, employees, personal, and staff to effectuate this continuous and circular stream of transportation, storage, treatment, and release of PCBs to and from the Pittsfield plants, facilities,

and dumping sites, as alleged throughout this complaint.

414. Defendants, GE and SABIC, caused the continuous release of the PCBs that contaminated and harmed the plaintiff, including by causing plaintiff's cancers.

415. As a direct and proximate cause of these aforementioned violations of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G.L. c. 21E, of defendants, GE and SABIC, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

**COUNT XIV – VIOLATION OF THE MASSACHUSETTS OIL AND HAZARDOUS MATERIAL RELEASE PREVENTION AND RESPONSE ACT, G.L. c. 21E**
**PLAINTIFF v. MONSANTO COMPANY, SOLUTIA INC., PHARMACIA LLC, AND BAYER AG**

416. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

417. At all times material hereto, defendants, Monsanto, Solutia, Pharmacia, and Bayer, by contract, agreement, or otherwise, directly and/or indirectly, arranged for the transport, storage and/or treatment of PCBs to or in a site or vessel from or at which there is or has been a release of PCBs.

418. At all times material hereto, defendants, Monsanto, Solutia, Pharmacia, and Bayer, directly and/or indirectly transported PCBs, which are a hazardous material, to transport, disposal, storage and/or treatment vessels or sites from or at which there is and has been, and to this day continues to be, releases of PCBs and the threat of release of PCBs, which are a hazardous material.

419. At all times material hereto, defendants, Monsanto, Solutia, Pharmacia, and

Bayer, have been and are caused and are legally responsible for the release of PCBs in the public and community, including Pittsfield and throughout Berkshire County.

420. At all times material hereto, defendants, Monsanto, Solutia, Pharmacia, and Bayer, have been and are caused and are legally responsible for the threat of release of PCBs in the public and community, including Pittsfield and throughout Berkshire County.

421. PCBs are hazardous material, in fact, and as defined by the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G.L. c. 21E.

422. For decades, and up until this day, there have been and are currently releases of hazardous PCBs from sites and/or vessels over which defendants, Monsanto, Solutia, Pharmacia, and Bayer, have possession and control.

423. As alleged throughout the complaint, for decades, defendants Monsanto, Solutia, Pharmacia, and Bayer, transported, arranged for transport, stored, treated, and released PCBs, which are a hazardous material, to and from defendants, GE and SABIC at their Pittsfield plants, facilities, and dumping grounds. Defendants, Monsanto, Bayer, Pharmacia, and Solutia, and defendants, GE and SABIC, had and have had a continuous and circular stream of transportation, storage, treatment, and release of PCBs to and from the Pittsfield plants, facilities, and dumping sites, as alleged throughout this complaint.

424. Defendants, Monsanto, Solutia, Pharmacia, and Bayer, for decades, used various vehicles, trucks, automobiles, employees, personal, and staff to effectuate this continuous and circular stream of transportation, storage, treatment, and release of PCBs to and from the Pittsfield plants, facilities, and dumping sites, as alleged throughout this complaint.

425. Defendants, Monsanto, Solutia, Pharmacia, and Bayer, caused the continuous release of the PCBs that contaminated and harmed the plaintiff, including by causing plaintiff's cancers.

426. As a direct and proximate cause of these aforementioned violations of the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G.L. c. 21E, of defendants, Monsanto, Solutia, Pharmacia, and Bayer, plaintiff was caused to suffer the injuries and damages set forth throughout this Complaint.

**WHEREFORE**, Plaintiff respectfully demands judgment against Defendants, including punitive damages, individually, jointly and severally, for sums including all interest, prejudgment interest and costs.

## PRAYER FOR RELIEF

For the above reasons, plaintiff demands the following relief against defendants, GE, SABIC, Monsanto, Solutia, Pharmacia, and Bayer AG, jointly and severally:

1. Judgment for plaintiff on all counts in the complaint;

2. Compensatory damages in an amount to be proven at trial, plus all applicable and available prejudgment interest and post judgment interest;

3. Punitive damages in an amount to be proven at trial, plus all applicable and available prejudgment interest and post judgment interest;

4. Attorney's fees and expenses;

5. Costs of suit;

6. All damages allowable under the Massachusetts Oil and Hazardous Material Release Prevention and Response Act, G.L. c. 21E; and

7. Any other and further relief that the Court deems just, proper, and appropriate.

## JURY DEMAND

Plaintiff, Virginia Crocker-Timmins, demands a jury trial on all issues so triable.

Respectfully submitted,

By: */s/ Thomas E. Bosworth*
Thomas E. Bosworth, Esquire
**BOSWORTH LAW, LLC**
123 S. Broad Street, Suite 1620
Philadelphia, PA 19109
Tel.: 267-928-4183
Website: bosworthfirm.com
Email: tom@bosworthfirm.com
*Attorney for Plaintiff*
*Pro Hac Vice pending*

By: */s/ Austin Dana*
Austin Dana, Esquire (BBO 683113)
**KECHES LAW GROUP**
101 Dyer Street 5th Flr
Providence, RI 02806
Tel.: (508) 659-1065
Email: adana@kecheslaw.com
*Attorney for Plaintiff*

Dated : August 14, 2026